**UNITED STATES of America, Plaintiff,**

v.

**AMERICAN TELEPHONE & TELEGRAPH COMPANY, Western Electric Co., Inc., Bell Telephone Laboratories, Inc., Defendants.**

**Civ. A. No. 74–1698.**

United States District Court,
District of Columbia.

Sept. 11, 1978.

On Motion for Reconsideration
Oct. 18, 1978.

See also, D.C., 427 F.Supp. 57.

Kenneth C. Anderson, Washington, D. C., argued and on brief, for plaintiff; Jules M. Fried, Peter B. Kenney, Jr., U. S. Dept. of Justice, Washington, D. C., on brief.

George L. Saunders, Jr., Chicago, Ill., for defendants; Harold S. Levy, Edward F. Barnicle, Jr., Leonard Joseph, New York City, George L. Saunders, Jr., Robert D. McLean, Chicago, Ill., Richard J. Flynn, Washington, D. C., on brief; F. Mark Garlinghouse, George V. Cook, New York City, William L. Keefauver, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Sidley & Austin, Chicago, Ill., of counsel.

Randolph May, for Federal Communications Commission as amicus curiae; Robert R. Bruce, John E. Ingle, Lawrence S. Schaffner, Charles L. Spencer, Federal Communications Commission, Washington, D. C., on brief.

## OPINION

HAROLD H. GREENE, District Judge.

The motions before the Court address the Court's jurisdiction and they raise fundamental issues concerning the discovery that should govern the future path of this antitrust litigation. A recapitulation of the history of this case will be helpful to an understanding of these issues.

The complaint was filed on November 20, 1974. It alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, by the American Telephone and Telegraph Company (AT&T),[1] Western Electric Company,

---

1. According to the government, AT&T is organized under the laws of the State of New York, with the stock of Western Electric, fifty per cent of the stock of Bell Labs, and all or part of the stock of the 23 Bell Operating Companies as its principal assets. It is divided operationally into two major divisions: Long Lines and the General Departments. Long Lines, which has a certificate of convenience and necessity from the Federal Communications Commission, provides interstate telephone service, and files tariffs with the Commission governing the terms, rates, and conditions of its service. The General Departments provide AT&T, Western Electric, Bell Labs, and the Bell Operating Companies with various kinds of advice and assistance. The General Departments have no federal or state certificates of public convenience and they file no tariffs.

Inc. (Western Electric),[2] and Bell Telephone Laboratories, Inc. (Bell Labs).[3] In sweeping language the complaint alleges that an unlawful combination and conspiracy exists and has existed for many years among the defendants and certain co-conspirators (primarily the Bell Operating Companies),[4] designed to permit AT&T to maintain control over Western Electric, Bell Labs, and the Bell Operating Companies; to restrict competition from other telecommunications[5] systems and carriers and from other manufacturers and suppliers of telecommunications equipment; and to cause Western Electric to supply substantially all the telecommunications requirements of the Bell System.

The complaint explains that the defendants are violating the antitrust laws by various monopolistic practices including the refusal to sell terminal equipment to subscribers of Bell System telecommunications service, the creation of obstructions to the interconnection of various carriers with the Bell System, and the maintenance of a monopolistic manufacturing and purchasing relationship between Western Electric and the Bell System. It is further alleged that, as a consequence of these practices (1) defendants have achieved and are maintaining a monopoly of telecommunications service and equipment; (2) competition in these areas has been restrained; and (3) purchasers of telecommunications service and equipment have been denied the benefits of a free and competitive market. Among other relief, the action seeks the divestiture by AT&T of all Western Electric stock; the separation of some or all of the Long Lines Department of AT&T from the Bell Operating Companies; the divestiture by Western Electric of its manufacturing and other assets sufficient to insure competition in the manufacture and sales of telecommunications equipment; and such relief against Bell Labs as the Court may find appropriate.

Defendants' Answer, and the Court *sua sponte*, raised two threshold defenses: (1) that a decree entered in 1956 by the U.S. District Court for the District of New Jersey (*United States v. Western Electric Co.*, Civil Action No. 17-49 (D.N.J.1956)) is *res judicata*, and (2) that the matters complained of by the government are within the exclusive jurisdiction of the Federal Communications Commission and therefore immune from scrutiny under the antitrust laws. On October 1, 1976, the Court rejected the claim of *res judicata*, and on November 24, 1976, it ruled that defendants do not possess blanket immunity from antitrust liability by virtue of the Communications Act of 1934 or their regulation by the Federal Communications Commission. In rejecting the plea that the FCC has exclusive jurisdiction over the subject matter of this litigation, the Court further stated, however, that it might in the future refer particular issues to the Commission under the so-called doctrine of primary jurisdiction. *United States v. Am. Tel. & Tel. Co.*, 427 F.Supp. 57 (D.D.C.1976) (Waddy, J.), *cert. denied*, 429 U.S. 1071, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977), *cert. denied*, No. 77–1009 (D.C.Cir. May 27, 1977), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977).

2. Western Electric is the 12th largest individual corporation in the United States, with sales of over $7 billion. It owns fifty per cent of the stock of Bell Labs, and it has at least one wholly owned subsidiary. It is not regulated by any federal or state regulatory authority. See pp. 1324 1325 *infra*.

3. Bell Labs is owned in equal parts by AT&T and Western Electric. It conducts research and development, primarily for AT&T, Western Electric, and Bell Operating Companies. Like Western Electric, it is not regulated by any federal or state regulatory authority. See pp. 1324-1325, *infra*.

4. There are 23 Bell Operating Companies which, along with many other non-Bell companies, provide primarily intrastate, and some interstate service, pursuant to certificates of public convenience and necessity.

5. Telecommunications is defined as the electronic and electromagnetic transmission of voice, data, and other communications by wire, cable, microwave radio, and communications satellite.

Shortly after the filing of the complaint, in November of 1974, and while these legal issues were being litigated, the parties began to engage in discovery.[6] Defendants served a request for production of documents upon the government, as well as a comprehensive set of interrogatories. The government, for its part, filed numerous discovery requests upon defendants and each of the operating telephone companies in which AT&T holds a majority interest, and it began fairly extensive third party discovery. Disputes arose almost immediately, however, with each side accusing the other of making unduly broad requests and of engaging in obstructive conduct in relation to opposing requests.

These controversies became moot in relatively short order, as the course of discovery was stayed pending resolution of the jurisdictional issues.[7] Eventually, and contemporaneously with its ruling on these issues, the Court issued an order vacating the stay that had been in effect for almost 22 months.[8] and shortly thereafter, pursuant to stipulation of the parties, it issued a number of other pretrial orders, which established machinery for the recommencement of discovery.[9] Almost immediately upon the entry of these orders, defendants sought review of the Court's ruling on the jurisdictional issues by petitioning both the U.S. Court of Appeals and the U.S. Supreme Court for writs of certiorari,[10] and during the pendency of these petitions in the appellate courts, all proceedings in this Court, including discovery, were again stayed, this time, with one brief interruption, from January 25, 1977, to November 28, 1977.[11]

When the last certiorari petition was denied, and the stays were dissolved, the parties filed a number of proposed orders concerning pretrial discovery,[12] and the Court, by its order of February 7, 1978, referred the case to Magistrate Lawrence S. Margolis to direct the preparation of a discovery schedule (see p. 1348, *infra*). At the same time, it denied two pretrial orders (Nos. 9 and 12) submitted by defendants which again raised the issue of the Court's jurisdiction; denied proposals for pretrial orders

---

**6.** As early as 1973, prior to the institution of this action, the government had issued an extensive civil investigative demand, and the Bell System in fact produced documents pursuant to that demand. In addition, according to an attachment to plaintiff's response to defendants' first set of interrogatories, the Justice Department had a number of interviews and contacts with potential witnesses prior to the filing of the complaint.

**7.** For that reason, the Court did not become extensively involved with discovery at that time, and it issued only one order which dealt expressly with the discovery process. That order (Pretrial Order No. 1) in essence preserved the status quo with respect to the existence of documents, by requiring plaintiff to retain and secure from destruction all documents requested by defendants from over forty government agencies, and by compelling defendant to retain and secure from destruction all its files which might be relevant to this action.

**8.** Pretrial Order No. 4.

**9.** Pretrial Orders 5–8, *inter alia*, fixed certain dates for the filing of interrogatories; set up voluntary procedures governing the production of documents by the parties pursuant to Rule 34 and for Rule 45 discovery relating to nonparties; required discovery requests to be specific; established an explicit definition of "pro-

tected" documents and a comprehensive scheme for treatment of such documents, including the appointment of a special master to pass on claims of privilege; and provided that the voluntary Rule 34 discovery procedures were revocable by any party upon fifteen days' notice to the other party. In addition, on that date, the Court issued a "Stipulation and Order Concerning Documents in the Possession, Custody, or Control of Agencies other than the Department of Justice." This document set up a procedure for the voluntary production of documents from those agencies to defendants.

**10.** Jurisdiction was claimed under the All Writs Act, 28 U.S.C. § 1651, but, as noted *supra*, both courts ultimately declined to entertain defendants' petitions.

**11.** The U.S. Court of Appeals issued two stays of the proceedings. On January 25, 1977, it entered a stay on its own motion until the matters raised in defendants' petition could be adequately briefed and ruled upon, and on August 11, 1977, it entered a stay on defendants' motion for the period required to seek certiorari in the Supreme Court.

**12.** Plaintiff and defendants each submitted five proposed pretrial orders.

(Nos. 10 and 11) which would have dealt in various ways with documents generated in private antitrust proceedings in which AT&T is a defendant; and referred to the Magistrate defendants' proposed Pretrial Order No. 13 which would have established that all agencies and departments of the United States government are party plaintiffs in this suit for purposes of discovery. All of these matters, which are still pending, are discussed in detail below.

Pursuant to the authority vested in him by the Court, Magistrate Margolis on April 27, 1978, issued two discovery orders.[13] Defendants objected to the second of these orders, and appealed it to the Court (28 U.S.C. § 636(b)(1)(A)) which approved a provision establishing a mechanism for the voluntary production of documents from government agencies, but otherwise stayed the effect of the order.[14] Since that time, there has been little activity,[15] and such discovery as has been attempted has been the subject of intense controversy.

The case was assigned to this Court on June 22, 1978. On July 6, 1978, the parties were directed to file status memoranda on all outstanding issues, and on August 21, 1978, argument was heard on these matters.[16] While these issues arose in varying

procedural contexts, they may conveniently be discussed under four headings: (1) jurisdiction, (2) the nature of the plaintiff, (3) the government's effort to secure access to documents collected in several private antitrust suits brought against defendants in other districts, and (4) the future course of this action, including the scheduling of proceedings and the authority of the Magistrate and the Special Masters.

I

■ In all of their submissions to this Court, defendants have vigorously and consistently raised the jurisdictional issue. They insist that an irreconcilable conflict exists between the antitrust laws and the regulatory scheme established by the relevant statutes,[17] that when there is such a conflict the antitrust laws must give way, and that therefore the Court lacks jurisdiction over this action. While in many respects defendants' contentions constitute rearguments of matters rejected by Judge Waddy in his order of November 24, 1976, in view of the importance of this issue, and since a claim of lack of jurisdiction may be raised and entertained at any time (Rule 12(h)(3), F.R.Civ.P.), I have independently considered the jurisdictional issues. Upon

---

**13.** Discovery Order No. 1 ordered defendants to produce documents requested by the government on February 3, 1977, after the first Court of Appeals stay had been entered, and also ordered the Justice Department to commence production of documents from its own files. Discovery Order No. 2 established explicit procedures for discovery of documents generated in private antitrust suits in which AT&T was a defendant as well as in federal and state regulatory proceedings involving defendants, and it set up procedures for voluntary discovery by AT&T from government agencies other than the Justice Department. The order also provided for a comprehensive discovery schedule, including the setting of dates for preliminary orders of proof and for termination of discovery.

**14.** The Court also consolidated the issue concerning defendants' proposed Pretrial Order No. 13 with the appeal from the Magistrate's Discovery Order No. 2 for purposes of disposition.

**15.** However, on June 29, 1978, the Court, acting pursuant to Rule 53, F.R.Civ.P., and the still viable Pretrial Order No. 7 to which the parties

had stipulated, appointed Professors Paul Rice of American University and Geoffrey Hazard of Yale University as Special Masters to deal with claims of privilege in the discovery process. The order of reference charged the Special Masters with making "findings of fact and conclusions of law with respect to the matters presented to them by the parties and report expeditiously to the court pursuant to Rule 53(e) . . .;" permitted them to make all arrangements necessary to accomplish those duties; provided that the decisions of the Special Masters would be subject to review *de novo* by the Court upon timely application of the parties, and directed that any matter upon which the Special Masters could not agree would be submitted to the Court for resolution.

**16.** Because of the illness and death of Judge Joseph C. Waddy, to whom the case had originally been assigned, several motions were reargued to this Court.

**17.** Principally the Communications Act of 1934, 47 U.S.C. § 151, et seq.

such reconsideration, I concur with Judge Waddy's conclusion that regulation by the Federal Communications Commission and state regulatory bodies does not immunize defendants from this antitrust action.

Telecommunications carriers clearly do not enjoy an express statutory immunity from antitrust enforcement with respect to the activities here involved. While Congress has not hesitated in so many words to exempt the practices of other industries from the antitrust laws,[18] and while it has statutorily exempted some activities of telephone companies from those laws,[19] it has not done so with respect to the conduct which is the subject matter of this complaint. Likewise, defendants have cited nothing in the legislative history of the statutes regulating the telecommunications industry which would lead to the conclusion that an antitrust immunity was contemplated when those statutes were enacted. Thus, if the Court lacks jurisdiction, it could only be because defendants enjoy an immunity by implication, resulting from an incompatibility between the antitrust laws and the statutes which regulate the telecommunications industry.

The problem created by the tension between the antitrust laws and economic regulation has been long recognized. See, e. g., *United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1879); 2 A. Kahn, *The Economics of Regulation: Principles and Institutions* 1, 4–5 (1971). Broadly speaking the

antitrust laws are rooted in the proposition that the public interest is best protected by competition, free from artificial restraints such as price-fixing and monopoly.[20] The theory of regulation, on the other hand, presupposes that with respect to certain areas of economic activity the judgment of expert agencies may produce results superior to those of the marketplace,[21] and that for this reason competition in a particular industry will not necessarily serve the public interest.[22] Because of these divergent objectives, it could be, and has been, argued that whenever the Congress has established a scheme of regulation through an independent commission, it must be deemed to have determined that the antitrust laws should not apply to the industry thus being regulated. That, however, is not the law.

The Supreme Court has repeatedly noted that "repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973), quoting *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Accord, *Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726, 733, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 126, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973); *Carnation Co. v. Pacific Westbound Conference et al.,* 383 U.S. 213, 217–8, 86 S.Ct. 781, 15

---

**18.** *E. g.,* insurance (McCarran-Ferguson Act, 15 U.S.C. § 1012); air transportation (Federal Aviation Act, 49 U.S.C. § 1384); export trade associations (Webb-Pomerene Act, 15 U.S.C. § 62); surface transportation (Reed-Bulwinkle Act of 1948, 49 U.S.C. § 5b(9)).

**19.** 47 U.S.C. §§ 221(a) and 222(c)(1) exempt certain FCC-approved consolidations and mergers of telephone companies.

**20.** The antitrust laws are a "comprehensive charter of economic liberty" (*Northern Pac. R. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)) whose goals have been described in many ways, from the advancement of consumer welfare (Bork, *The Antitrust Paradox* (1978), pp. 50–66) to the more radical objective of the diffusion of power in economic

decision-making (A. Neale, *The Antitrust Laws of the USA* (2d ed. 1970), pp. 427–432; and Mr. Justice Douglas' dissent in *United States v. Columbia Steel Co.,* 334 U.S. 495, 536, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). See also, P. Areeda and D. Turner, Antitrust Law, vol. 1, par. 103, et seq. (1978).

**21.** However, regulatory agencies sometimes seek to achieve their objectives, at least in part, through the fostering of competition.

**22.** This may be so because the market is one of natural monopoly, in that it is incapable effectively to support more than one firm, or because of other economic, public policy, or political reasons.

L.Ed.2d 709 (1966); *Silver v. New York Stock Exchange*, 373 U.S. 341, 357–8, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *United States v. Borden Co.*, 308 U.S. 188, 198–9, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

▮ Regulated industries "are not per se exempt from the Sherman Act" (*Georgia v. Pennsylvania R. R. Co.*, 324 U.S. 439, 456, 65 S.Ct. 716, 725, 89 L.Ed. 1051 (1945)),[23] and they are not necessarily exempt even if the conduct complained of in an antitrust context has been expressly approved by the agency charged with regulating the particular industry.

In *United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), a decision by the Federal Communications Commission specifically approving an exchange of television stations was asserted as a defense to an antitrust divestiture action. The Supreme Court rejected that contention, holding, as Mr. Justice Harlan expressed it in his concurring summary of the Court's decision (358 U.S. at 353, 79 S.Ct. at 468), "a Commission determination of 'public interest, convenience, and necessity' cannot either constitute a binding adjudication upon any antitrust issues that may be involved in the Commission's proceeding or serve to exempt a licensee pro tanto from the antitrust laws

. . . ."[24] See also *California v. Federal Power Commission*, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); *United States v. Philadelphia National Bank, supra*; *Otter Tail Power Co. v. United States, supra*.[25]

These principles have been applied to the area of jurisdiction of the Federal Communications Commission (*United States v. Radio Corporation of America, supra*) and to telephone companies specifically. *E. g., Industrial Communications Systems, Inc. v. Pacific Tel. & Tel.*, 505 F.2d 152, 156 (9th Cir. 1974); *International Tel. & Tel. v. General Telephone & Electronics Corp.*, 351 F.Supp. 1153, 1182 (D. Haw., 1972), *aff'd. in part and rev'd. in part*, 518 F.2d 913, 918–20 (9th Cir. 1975); *Macon Products Corp. v. Am. Tel. & Tel. Co.*, 359 F.Supp. 973 (C.D. Cal.1973).

▮ Regulated conduct is, however, deemed to be immune by implication from the antitrust laws in two[26] relatively narrow instances: (1) when a regulatory agency has, with congressional approval, exercised explicit authority over the challenged practice itself (as distinguished from the general subject matter) in such a way that antitrust enforcement would interfere with regulation (*Pan American World Airways v. United States*, 371 U.S. 296, 83 S.Ct. 476, 9

---

23. The antitrust laws apply notwithstanding regulation in such industries as the production of natural gas (*California v. Federal Power Commission*, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962)); generation and transmission of electric power (*Otter Tail Power Co. v. United States, supra*); national banking (*United States v. Philadelphia National Bank, supra*); securities and commodities exchanges (*Silver v. New York Stock Exchange, supra*; *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973)); and broadcasting (*United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959)).

24. If the law were otherwise, the specific statutory immunity granted, for example, to telephone companies with respect to certain FCC-approved mergers (see Note 19, *supra*), would be redundant and unnecessary. See *Wilderness Society v. Morton*, 156 U.S.App.D.C. 121, 135, 479 F.2d 842, 856 (1973), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

25. *Otter Tail* involved a District Court decree which required an electric power utility company to remedy its antitrust violations by establishing certain power interconnections. In response to the company's argument that by reason of the Federal Power Act it was not subject to the antitrust laws, the Supreme Court stated that, absent a direct conflict between the federal judicial decree and an order of the Federal Power Commission concerning specific interconnections, antitrust jurisdiction was not ousted. "It will be time enough to consider whether the antitrust remedy may override the power of the [Federal Power] Commission under § 202(b) as, if, and when the Commission denies the interconnection and the District Court nevertheless undertakes to direct it" (410 U.S. at 377, 93 S.Ct. at 1029).

26. The two categories are not clearly distinct, and they sometimes merge in their analysis and application.

L.Ed.2d 325 (1963); *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 468 (1975); *United States v. National Association of Security Dealers*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975)), and (2) when regulation by an agency over an industry or some of its components or practices is so pervasive that Congress is assumed to have determined competition to be an inadequate means of vindicating the public interest. *Otter Tail Power Co. v. United States, supra*, 410 U.S. at 373–78, 93 S.Ct. 1022; *United States v. National Association of Security Dealers, supra* ; *Silver v. New York Stock Exchange, supra*.

*Gordon v. New York Stock Exchange, supra*, upon which defendants heavily rely, and *United States v. National Association of Security Dealers* (NASD), *supra*, decided the same day, are the most recent Supreme Court expressions on the kind of analysis that must be applied in determining when an antitrust suit will lie against a member of a regulated industry.

*Gordon* was an action brought by small investors who challenged a system of fixed stock exchange commission rates sanctioned by the SEC. In its decision, the Court reaffirmed what it had held many times before: that repeal of the antitrust laws is not favored; that repeal will be implied only where there is a plain repugnancy between antitrust and regulatory provisions and then only to the minimum extent necessary; that in the absence of regulatory supervision there can be no conflict; and that both the presence of a pervasive regulatory scheme and the existence of regulatory action under a specific regulatory provision are factors in finding a repeal of the antitrust laws by implication (422 U.S. at 682–689, 95 S.Ct. 2598). The Court then went on to find regulation by the SEC to be such regulatory action, and section 19(b)(9) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(b), which grants to the Commission review power over the fixing of commission rates, to be such a specific regulatory provision.

The Court indicated that in making that determination it was heavily influenced by two factors: (1) by granting to the SEC permission to approve the fixing of commission rates after the Court's decision in *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927) (which had held this kind of rate fixing to be a per se violation of the Sherman Act), the Congress had made a deliberate choice to give the agency the authority to supervise self-regulation with respect to commission rate fixing (422 U.S. at 681, 685, 95 S.Ct. 2598), and (2) the Commission had "taken an active role in review of proposed rate changes during the last 15 years" (422 U.S. at 685, 95 S.Ct. at 2613). Thus it concluded (422 U.S. at 691, 95 S.Ct. at 2615),

> The statutory provision authorizing regulation, § 19(b)(9), the long regulatory practice, and the continued congressional approval illustrated by the new legislation, point to one, and only one, conclusion. The Securities Exchange Act was intended by Congress to leave the supervision of the fixing of reasonable rates of commission to the SEC. Interposition of the antitrust laws, which would bar fixed commission rates as per se violations of the Sherman Act, in the face of positive SEC action, would preclude and prevent the operation of the Exchange Act as intended by Congress and as effectuated through SEC regulatory activity. Implied repeal of the antitrust laws is, in fact, necessary to make the Exchange Act work as it was intended; failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates.

Similarly, in *NASD, supra*, the Court held that vertical restrictions in secondary market activities designed to maintain prices in brokerage transactions of specified mutual fund shares were precisely among the kinds of restrictions on competition that Congress might have thought were "necessitated by the unique problems of the mutual fund industry . . ." (422 U.S. at 729, 95 S.Ct. at 2447) when it enacted section 22(f) of the Investment Company Act of 1940, 15

U.S.C. § 80a–1 et seq. With respect to the alleged horizontal combination and conspiracy to prevent the growth of a secondary dealer market in the purchase and sale of mutual fund shares, the Court found the SEC's exercise of regulatory authority to be so pervasive as to confer an implied immunity. The Court held "fatal" to the government's complaint that the SEC had consistently and for nearly 35 years approved the restrictive agreements to which the activities the antitrust action sought to curb were ancillary (422 U.S. 733–4, 95 S.Ct. 2427), and it found significant the SEC's urging that its authority would be seriously compromised if the agreements were deemed actionable under the Sherman Act (422 U.S. at 729, 95 S.Ct. 2427).[27]

Thus, the inquiry in this case must focus upon (1) whether the activities which are the subject of this complaint were required or approved by the Federal Communications Commission, pursuant to explicit statutory authority, in a way that is incompatible with antitrust enforcement, and (2) whether these activities are being so "pervasively" regulated that an immunity from antitrust action must be assumed. In my judgment, these questions must be answered in the negative.

■ We do not start with a clean slate, neatly balancing whether there should or should not be antitrust jurisdiction. The complaint alleges serious violations of the Sherman Act, and if the government is able to prove these allegations, it follows that a substantial violation of that fundamental charter of American economic life has occurred. The burden is on defendants to demonstrate that they or their practices were intended to be exempt or immune from the broad mandate of the Act. To carry that burden, defendants rely on the Supreme Court decisions discussed above which found certain companies to be immune from the antitrust laws based upon a degree of regulation by government agencies which, as a practical matter, left them no choice but to follow the regulatory schemes and orders. But such regulation is not present in this case.

At the outset, it must be noted that two of the defendants in the instant action, Western Electric and Bell Labs, are not subject to direct regulation by the Federal Communications Commission at all. Defendants' assertion that "each of the general charges of alleged conduct . . . relates to matters which are within the jurisdiction of the regulatory agencies" (Status Memorandum, p. 5), is contradicted by the more precise and more accurate statement of the Federal Communications Commission (Memorandum as *amicus curiae*, filed December 30, 1975, pp. 21–25) that it "has no direct regulatory responsibility for . . . Western Electric and Bell Laboratories," although it may indirectly affect them through its determinations of the reasonableness of expense and rate base items claimed by AT&T. See *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930). Legislative history over the years shows that congressional concern over AT&T's intra-corporate structure never matured beyond directing the Federal Communications Commission to conduct a study. Once that study was completed (Federal Communications Commission, *Report on the Investigation of the Telephone Industry in the United States*, H.R.Doc. No. 340, 76th Cong., 1st Sess. (1939)), Congress took no further action, nor was the Commission given authority to take further action.

27. *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1972), and *Pan American World Airways v. United States, supra*, also relied on by defendants in this proceeding, involved similarly explicit regulatory schemes. In *Hughes Tool*, the Court found that the challenged transactions fell precisely within the detailed scheme for administrative treatment established by Congress in section 408 of the Federal Aviation Act of 1958, 49 U.S.C. § 1378, and that, inasmuch as the Civil Aeronautics Board had issued an order under that section approving them, the transactions were immunized from the antitrust laws by section 414 of the Act, 49 U.S.C. § 1384. Similarly, in *Pan American Airways*, the Court held that section 411 of the Federal Aviation Act of 1948, 49 U.S.C. § 1381, had granted to the CAB the very jurisdiction (over unfair competition in air traffic) that was at the heart of the antitrust complaint.

Consequently, it has been the Federal Communications Commission's consistent position that it has no authority to alter, regulate, or otherwise to interfere with AT&T's internal structure, including its relationships with Western Electric and Bell Labs. See Federal Communications Commission, *Report on the Investigation of the Telephone Industry in the United States, supra,* at 487–589; Consent Decree Program of the Department of Justice, *Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary,* 85th Cong., 2d Sess. Part II–Vol. II (1958);[28] Consent Decree Program of the Department of Justice, *Hearings before the Antitrust Subcommittee of the House Committee of the Judiciary,* 85th Cong., 2d Sess. Part II–Vol. III (1958);[29] Antitrust Problems of the Space Satellite Communications System, *Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary,* 87th Cong., 2d Sess. 281 (1962);[30] *AT&T Charges for Interstate Telephone Service (Phase II),* 64 FCC.2d 1 (1977), pp. 15, 18, 20, 27; and see *International Tel. & Tel. Co. v. General Telephone & Electronics Corp.,* 518 F.2d 913 (9th Cir. 1975). Beyond broad general statements, defendants have cited nothing to the contrary. In view of this history, it is difficult to see on what basis Western Electric, Bell Labs, or the relationships involving them, could be considered immune from the antitrust laws on any theory.

AT&T's Long Lines Department and the Bell Operating Companies are in a somewhat different posture, for they are subject to FCC regulation in a variety of ways, and the Commission has to a substantial extent exercised this authority. See, *e. g., Specialized Common Carrier Services,* 29 FCC.2d 870, 31 FCC.2d 1106 (1971), *aff'd. sub nom., Washington Utilities and Transportation Commission v. Federal Communications Commission,* 513 F.2d 1142 (9th Cir. 1975), *cert. denied sub nom., National Association of Regulatory Utility Commissioners v. Federal Communications Commission,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *MCI Communications Corp. v. Am. Tel. & Tel. Co.,* 496 F.2d 214 (3rd Cir. 1974). But there is nothing in either the Communications Act or the related statutes to suggest that, with respect to the activities and relationships[31] which are significant to this case, Congress intended to vest in the Federal Communications Commission such pervasive regulatory authority as to override antitrust considerations, nor is there anything to indicate that the antitrust laws are incompatible with the operation of these regulatory statutes as intended by the Congress.

The situation here is thus considerably different from that presented in *Gordon v. New York Stock Exchange, supra.*[32] In

**28.** A letter dated November 30, 1955, from Chairman George C. McConnaughey of the Federal Communications Commission to the Attorney General, introduced at the 1958 hearings, states that "the operations of Western, including its prices and profits, are, of course, not subject to direct control by any regulatory authority." Consent Decree Program of the Department of Justice, *supra,* Vol. II at 2233–34.

**29.** Bernard Strassburg, Chief of the Telephone Division of the Federal Communications Commission, testified in those hearings that the Commission lacks the authority to directly regulate Western Electric. Consent Decree Program of the Department of Justice, *supra,* Vol. III at 3446, 3543–44.

**30.** Chairman Newton N. Minow of the Federal Communications Commission testified before the Committee in 1962 that "we have no statutory authority to regulate the prices charged by

Western Electric for its equipment sales to the American Telephone & Telegraph Co." Antitrust Problems of the Space Satellite Communications System, *supra* at 283.

**31.** *E. g.,* relationships with private mobile radio systems, radio common carriers, miscellaneous common carriers, specialized common carriers, and manufacturers and sellers of terminal equipment for communications systems.

**32.** The distinction is significant inasmuch as *Gordon,* and its companion case *United States v. National Association of Security Dealers,* represent the outer limits of the Supreme Court's application of the implied immunity doctrine. Other Supreme Court law is even more hospitable to the antitrust laws and less apt to imply an immunity.

*Gordon* the Supreme Court said that the antitrust laws could not be applied where the Congress had given the Securities and Exchange Commission exclusive jurisdiction to supervise the fixing of rates of commission for transactions on the stock exchanges and where the Securities and Exchange Commission had in fact exercised that jurisdiction. By contrast, the Federal Communications Commission has not been granted exclusive jurisdiction over what may be called the interconnection areas,[33] but by statute shares that jurisdiction with the courts. 47 U.S.C. § 406.[34]

More importantly, the regulatory charter of the Commission itself, while broad in many respects, is at the same time relatively weak. For example, telephone tariffs—a primary regulatory tool—become effective upon filing by the carrier after 90 days notice without the necessity for Commission scrutiny or approval (47 U.S.C. § 203(b)(1)); a carrier may file a new or revised tariff at any time (47 U.S.C. § 204); and the power of the Commission to suspend a tariff is limited to a five-month maximum (47 U.S.C. § 204). The weakness of the regulatory scheme is reinforced by a volume of tariff filings beyond the capacity of the Commission to handle. During the 12-month period from September 1974 through August 1975, the Commission received 1,371 tariff filings totaling 11,491 pages, and because of this volume, it was able to investigate only a small percentage of the tariffs.

Thus, it is not surprising that the Commission has concluded that "rate filings generally proceed from the carrier's independent judgment. . . ." Memorandum of FCC, filed December 30, 1975, pp. 19–20.

■ The statutory weaknesses, the general inability of the Commission to scrutinize all the tariffs submitted to it, and perhaps other factors (e. g., the lack of adequate resources effectively to regulate AT&T, a corporate giant),[35] have produced the result of a far less than pervasive or specific regulation of the areas that are critical to this case. In any event, whatever the reasons, it is clear that regulation of defendants' conduct has not been such that this antitrust action would disturb or interfere with it.[36]

■ The FCC—unlike, for example, the SEC in the stock exchange cases—has consistently taken the position that antitrust enforcement through court action is not precluded in this area.[37] *In the Matter of Amendment of Subpart F of Part 1 of the Commission's Rules*, 42 FCC 905, 906, 910–912 (1959); *In the Matter of the Applications of the Connecticut Water Co. & Wooldridge Bros., Inc.*, 25 FCC 1367, 1378 (1958). In its memorandum filed with the Court in this case on December 30, 1975, the Commission noted (p. 27):

To the Commission's knowledge, no court has ruled that the regulatory juris-

---

**33.** In addition to certain claimed violations with respect to manufacturing, research, and sales and purchases of the fruits of manufacturing and research, much of this suit involves defendants' alleged failure to allow various types of entities to interconnect.

**34.** Section 406 provides that "the district courts of the United States shall have jurisdiction . . . [of allegations of] any violation, by a carrier subject to this chapter which prevent the relator from receiving service in interstate or foreign communication by wire or radio, or in interstate or foreign transmission of energy by radio, from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or transmission under similar conditions to any other persons." See also, 47 U.S.C. §§ 207, 407, 414.

**35.** See, e. g., Business Week, *Why the Justice Department Took AT&T to Court*, (Nov. 30, 1974) pp. 68–70.

**36.** Even when the regulation is "pervasive," and the precise conduct attacked in an antitrust suit is being regulated, an immunity will be found only if the antitrust remedy conflicts with rather than complements the enforcement efforts of the regulatory agency. *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687 (9th Cir. 1977), *vacated and remanded on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978).

**37.** An agency's consistent construction of its own enabling legislation is entitled to considerable weight. See *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

diction of the FCC and/or state agencies has ousted entirely the antitrust jurisdiction of the district courts. Several courts have expressly rejected that argument, and have held that primary jurisdiction referral is the appropriate accommodation . . . The Commission has accepted primary jurisdiction referrals in many cases, has resolved the issues referred for its consideration, and has certified back the results for the courts' ultimate determination . . . This procedure has satisfactorily accommodated the regulatory requirements, and the Commission believes it to be preferable to total ouster of the antitrust courts.

Among the considerations it cited in support of its position, the Commission stressed, *inter alia*, that, while under section 214 of the Communications Act, 47 U.S.C. § 214, it has exclusive market entry authority, antitrust actions not only do not necessarily conflict with that authority, but might even complement it in appropriate circumstances; the courts and the Commission have concurrent responsibilities, but when there is a conflict, the doctrine of primary jurisdiction[38] is adequate to resolve the matter; the Commission has never considered its authority over equipment interconnection to displace the antitrust laws; and even with respect to tariffs, since, as noted *supra*, they often become effective without Commission scrutiny or approval, the courts appropriately exercise antitrust jurisdiction.[39]

An examination of the complaint in this proceeding against the implied immunity doctrine and its philosophic underpinnings verifies the Commission's conclusion.[40] The allegations of the complaint describe conduct that quite obviously was not stimulated by regulatory supervision or coercion; it is of a character that reflects defendants' business judgment that its profits might be maximized if potential competitors were discouraged from entering the various mar-

**38.** See note 45, *infra*.

**39.** The Commission considers, however, that when it has prescribed or specifically approved a tariff, its judgment must control (FCC Memorandum of December 30, 1975, p. 20).

**40.** While the district court decisions are not entirely consistent in this area, the better-reasoned cases likewise support these conclusions. In *Jarvis v. Am. Tel. & Tel.*, Civ. 74–1674 (D.D.C. August 7, 1978), Judge Robinson of this Court held that Commission regulation of interconnection and tariffs over this defendant is not so pervasive that regulatory control should be deemed inconsistent with the application of the antitrust laws. See also, *Industrial Comm. Sys. Inc. v. Pac. Tel. & Tel. Co.*, 505 F.2d 152, 156 (9th Cir. 1974); *Macon Products Corp. v. Am. Tel. & Tel. Co.*, 359 F.Supp. 973, 976 (C.D. Cal.1973). Despite defendants' contention that *Jarvis* is in error (Defendants' Reply to Supplemental Response for the United States), the decision is consistent with both the Supreme Court's and the Federal Communications Commission's views. See *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Georgia v. Pennsylvania R. R. Co.*, 324 U.S. 439, 454–460, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); Response of Federal Communications Commission in *Am. Tel. & Tel. Co. v. United States*, No. 77–1009 (D.C.Cir.), p. 18. The decisions cited by defendants in this regard are inapposite. *Western Electric Co. v. Milgo Electronics Corp.*, 1978–1 Trade Cases, No. 61,-960 (S.D.Fla.1976), *appeal dismissed*, 508 F.2d 1203 (5th Cir. 1978), involved a question of standing, the court noting only that because of a recent administrative program instituted by the FCC, certain paragraphs of a counterclaim might not be properly before the court. In *Citizens Utilities Co. v. Am. Tel. & Tel. Co.*, 1978–1 Trade Cases, No. 61,959 (N.D.Cal.1977), the court dismissed a sixteen-year old antitrust case for want of prosecution, stating by way of dictum that dismissal might also be warranted on exclusive or primary jurisdiction grounds because the FCC was the proper forum for the subject matter (division of revenues within the telephone industry). In *Data Corp. v. General Telephone Co. of California*, 1977–2 Trade Cases, No. 61,610 (C.D.Cal.1977), the court dismissed the complaint because of the peculiar subject matter, but expressly disavowed holding "that the telephone companies may never be sued under the antitrust laws," citing Judge Waddy's opinion in the instant case. *Monitor Business Machines, Inc. v. Am. Tel. & Tel. Co.*, 1978–1 Trade Cases, No. 62,610 (C.D.Cal.1978), and *Phonetele Inc. v. Am. Tel. & Tel. Co.*, 435 F.Supp. 207 (C.D.Cal.1977), both involved relatively narrow interconnection areas which the courts found to have been extensively regulated by the Federal Communications Commission. In short, all of these cases are distinguishable on their facts. To the extent that some language in the opinions may differ from the conclusion reached here, like Judge Robinson in *Jarvis*, I decline to follow them.

kets AT&T controls. See *Federal Maritime Commission v. Seatrain Lines, Inc., supra,* 411 U.S. at 733, 93 S.Ct. 1773; *Otter Tail Power Co. v. United States, supra,* 410 U.S. at 374, 93 S.Ct. 1022; *Silver v. New York Stock Exchange, supra.*

According to the complaint,[41] defendants have chosen to engage in a variety of predatory activities designed to shut out potential competitors from the telecommunications markets, including the denial to competing entities of interconnection privileges with AT&T's monopoly facilities; unlawful rate adjustments in response to competition; refusal to permit telephone customers to provide their own terminal equipment and to interconnect it to AT&T's network; and perpetuation of various production and marketing practices designed to curb competition. There is absolutely nothing to suggest that Congress expected the Commission to require or approve, or that the Commission did require or approve any of these practices. These activities not only violate the antitrust laws but they are also inconsistent with the purpose of the regulation, or at the very least they are not required or encouraged either by regulatory theory or by regulatory action.

■ In such a posture, the abstract philosophical differences between regulation and competition will hardly serve to oust the antitrust laws from their normal function and effect. The purpose of the implied immunity rule is to eliminate adherence to antitrust standards when there are irreconcilable differences between the antitrust laws and federal regulatory statutes.[42] But

the antitrust laws cannot be held hostage to a supposed irreconcilability between antitrust and regulatory enforcement when no such irreconcilability exists in fact, nor can the alleged unlawful actions of defendants be deemed protected from the Sherman Act by the cloak of generalized regulation of AT&T by the Commission.

■ In short, it would be a gross misconception of the realities to equate the instant statutory scheme, the relatively weak regulatory controls which have implemented that scheme, and defendants' alleged activities which offend both the antitrust laws and the regulatory purposes, with the kind of explicit regulation endorsing industry conduct which the Supreme Court has held in relatively few instances to be inconsistent with antitrust enforcement.[43]

■ There is another, alternative basis for reaching the same conclusion. This complaint alleges a broad conspiracy to monopolize various aspects of the telecommunications industry through a symbiotic relationship among AT&T, Western Electric, Bell Labs, and the Bell Operating Companies (see p. 1350, *supra*). Even if it be assumed, *arguendo,* that the Commission exercised explicit regulatory authority over some segments of the activities challenged in the complaint, it does not follow that defendants are immune from antitrust liability even with respect to them. Defendants' purpose is alleged to be the monopolization of the telecommunications service and equipment market, and the bulk of their conduct, including that revolving around Western Electric and Bell Labs, can-

---

41. See pp. 1349–1350, *supra.*

42. Immunity will be implied only if necessary to make the regulatory statutes work, "and even then only to the minimum extent necessary." *Gordon v. New York Stock Exchange, supra,* 422 U.S. at 685, 95 S.Ct. at 2613.

43. Additionally, it is not insignificant that, even with respect to that portion of defendants' activities which the Commission does regulate, only the courts can grant complete relief. The Commission has little authority to vindicate injury to competitors; there is no statutory provision authorizing it to order divestiture; and it is unable to adopt remedies designed to

foreclose future anticompetitive conduct. See generally, *Am. Tel. & Tel. Co. v. FCC,* 487 F.2d 865, 881 (2d Cir. 1973); *Nader v. FCC,* 172 U.S.App.D.C. 1, 520 F.2d 182, 206 (1975); cf. *Hewitt-Robins v. Freight-Ways, Inc.,* 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962); but see, *General Telephone Co. of the Southwest v. United States,* 449 F.2d 846 (5th Cir. 1971). Congress could hardly be deemed by implication to have conferred immunity on carriers such as these defendants when the effect of its assumed action would be to insulate the alleged antitrust violators from effective sanctions or relief.

not under any reasonable view be regarded as immune from antitrust enforcement by virtue of regulation. In that circumstance, the remainder of the challenged conduct is likewise subject to antitrust consideration, both because it constitutes a means for achieving an unlawful end (*California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)), and because it represents one facet of a larger monopolistic scheme. See *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 222, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 316, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973) (Marshall, J., dissenting).

According to the government (Brief in *Am. Tel. & Tel. Co. v. United States*, No. 77–1109 (D.C.Cir.), pp. 5–6), defendants dominate three markets—long distance transmission, equipment manufacturing, and local franchise monopolies—and they use the leverage from their control of each to defend and support their monopoly position in the other two. It is precisely in this kind of situation, that the doctrine of primary jurisdiction is most useful,[44] and this Court is fully prepared to refer appropriate issues to the FCC under that doctrine (see note 45, *infra*). But it would subvert the purposes of the antitrust laws totally to sever from the case and to refer to the

Commission some of the issues on the theory that it has exclusive jurisdiction when the consequence of such a referral would be that a significant portion of what is alleged to be one comprehensive, integrated, and mutually supporting conspiracy could never be considered by the courts. See *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). This would then leave the courts with a truncated antitrust action—a result that would stand the principle of careful non-interference between legitimate regulatory and antitrust enforcement on its head.

While it is not necessary here to rely directly upon these "comprehensive monopoly" principles in adjudicating the jurisdictional issue, they provide additional and alternative support for the conclusion that antitrust jurisdiction has not been ousted by the regulatory scheme.

 For these reasons, the Court rejects defendants' contention that the Court lacks antitrust jurisdiction over the matters alleged in the complaint. However, in the event that it should subsequently appear after the issues have been crystallized—e. g., after discovery has been completed—that with respect to some of defendants' conduct the Commission has special expertise or there may be a conflict between antitrust enforcement and regulation, the issues relating to such conduct will be referred to the Commission under the doctrine of primary jurisdiction.[45] But there is

---

44. See Mr. Justice Brennan's dissent in *Pan American World Airways v. United States, supra*, 371 U.S. at 331–2, 83 S.Ct. 476.

45. While the term "primary jurisdiction" has been widely used, including by the U. S. Supreme Court, it deserves some clarification. A referral under that doctrine does not oust a court of jurisdiction; it merely serves as a means for requesting a regulatory agency to make preliminary factual and legal determinations while reserving to the court the authority to decide the ultimate questions. Judge Waddy's opinion of November 24, 1976, concluded that some of the issues herein might be referred to the FCC under that doctrine. It is clear from *Ricci v. Chicago Mercantile Exchange, supra*, that such a referral is appropriate particularly where there is a need to resolve possible conflicts between the objectives of the

antitrust laws and the regulatory standards, and where an adjudication of such issues by the regulatory body will be of material aid in the ultimate decision of the antitrust issues. It is my intention, as it was Judge Waddy's, to make such appropriate references to the FCC. According to the Commission (Memorandum as *amicus curiae*, p. 29) issues which substantially affect the following matters should be referred to it under the principle of primary jurisdiction: (1) entry into or exit from a communications carrier market; (2) FCC orders requiring interconnection; and (3) tariff provisions which the Commission has approved or precluded. It would be premature at this point to conclude the extent to which these conditions exist with respect to particular issues in this case, or whether there may be other matters appropriate for referral to the Commission.

no basis for defendants' continued insistence that the jurisdictional issue [46] is not settled [47] or that, until it is settled in their favor, it is not possible to proceed with this case in a way that is fair to both parties. The issue was decided against defendants by Judge Waddy, and his decision was not disturbed either by the U. S. Court of Appeals or the U. S. Supreme Court. Upon careful reconsideration, this Court again reaches the conclusion that it has jurisdiction of this action and that no part of this case is within the exclusive jurisdiction of the Federal Communications Commission.[48]

## II

Defendants have submitted a proposed order providing that "the plaintiff in this case is the government of the United States of America including all of the departments, agencies, bureaus, and other subdivisions thereof from which defendants have sought recovery." The effect of this order, if adopted by the Court, would be to subject all agencies and departments of the government to discovery under Rule 34 of the Federal Rules of Civil Procedure. The Department of Justice argues that only it is a party, and that discovery from other government agencies and departments must proceed under the more restrictive provisions of Rule 45, F.R.Civ.P. The question that is raised by these opposing positions is "who is the plaintiff?"

It should be noted at the outset that some discovery has been and is being secured to a limited extent from government agencies other than the Department of Justice. On April 27, 1978, Magistrate Margolis, with the consent of the parties, entered Discovery Order No. 2, paragraph 4 of which requires some forty government agencies to respond to the following questions: (i) whether they will produce the documents designated in their entirety for inspection and copying; (ii) whether they object in whole or in part to defendants' designation and the reasons therefor; (iii) whether they will submit disputes over production of documents to the Magistrate for resolution without formal service of a subpoena; and (iv) whether they will submit claims of privilege to the Special Master or the Court for resolution. Generally, the agencies responded by stating that (i) they would not produce the documents in their entirety; (ii) they had objections to various aspects of the discovery sought; (iii) they would submit disputes over production to the Magistrate without formal service of a subpoena; and (iv) they would submit claims of privilege to the Special Master or the Court.[49]

---

**46.** *I. e.*, the issue of whether or not the Commission has *exclusive* jurisdiction.

**47.** Throughout their status memoranda, defendants assert that there must be "a prompt determination of the jurisdictional issue" (Reply Memorandum, p. 3), that the means to expedite this case is to have "an early and definitive resolution of the fundamental jurisdictional issue that overhangs all of the proceedings in this case" (Reply Memorandum, p. 49), and that the Court will have to resolve "once and for all *whether*—and, if so, the extent to which—it has jurisdiction" (emphasis supplied) (Status Memorandum, p. 47).

**48.** For that reason defendants' proposed Pretrial Order No. 9 which would limit discovery to the jurisdictional issues *seriatim*, followed in each instance by further briefing and court review, is denied.

**49.** There were variations in the responses of the agencies. For example, the General Services Administration noted that it would cooperate "provided AT&T is required to state with specificity its reasons for objecting to a GSA claim of privilege;" the Office of Management and Budget and the Council of Economic Advisers are willing to submit claims of privilege to the Court or the Special Masters "other than claims of executive privilege;" the Department of State "is unable to say at this time whether or not it may subsequently determine to submit certain claims of privilege only to the Court;" the Central Intelligence Agency said that privilege claims might in some cases have to be supplemented by *ex parte, in camera* proceedings; the Department of the Navy cautioned that "the anticipated extreme sensitivity of certain documents which are requested may require formal proceedings on privilege assertions prior to production;" the National Security Agency "will submit claims of privilege [only] to the court for resolution;" the Securities and Exchange Commission answered that "this statement does not constitute a waiver of any objections or other procedures that may be available to the SEC;" and the Department of the Treasury and the National Science Foundation likewise "will submit claims of privilege

Plaintiff contends that the present arrangement, together with whatever discovery defendants may be able to secure under Rule 45, adequately protects defendants' interests, and that therefore it is not necessary to decide the issue posed by defendants' proposed pretrial order. This position is not well taken, for a number of reasons.

First. The Department of Justice suggests that the voluntary system is working and will continue to work well. Yet it is apparent that problems already exist in the operation of that system, and these are likely to become magnified in the future. One difficulty is that the present procedure is cumbersome in view of the numerous agencies involved, the sheer size of the discovery requests addressed to them, and the fact that defendants are forced, more or less, to depend upon the good offices of the Department of Justice to secure this discovery.

Another, perhaps potentially even more serious, drawback is that the voluntary system permits each agency to continue to view itself as a distinct entity with individual interests which do not necessarily parallel those of the government as a whole in the prosecution of this suit! Not only does this place practical burdens on defendants, but it adds an awkward tension to discovery. AT&T requires each agency's full cooperation to obtain the discovery it needs, and if the agencies were to be considered part of the plaintiff in this action, it would be entitled to that cooperation as a matter of right. But if the agencies are not included in the concept of "plaintiff," there is no

such entitlement, and since the agencies (other than the Department of Justice) may have little to gain by their cooperation, whether by discovery or otherwise, they would be likely to limit the level of their participation in voluntary discovery to the minimum dictated by their own parochial interests.

Second. When dealing with the government, effective sanctions are not available for noncompliance with requests under Rule 45. The only real sanction contemplated by that Rule is contempt of court,[50] and it is normally available only against the head of an agency rather than a subordinate. *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951); *Boske v. Comingore*, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900); *Appeal of United States Securities & Exchange Commission*, 226 F.2d 501 (6th Cir. 1955). Thus, should government departments be or become reluctant to produce records at any stage during this litigation, the Court's only remedy, if it intended to protect defendants' rights, would be to hold high officials in wholesale contempt. Whatever might be the theoretical amenability of heads of government departments to the Court's contempt power, in the context of its possible application to many officials in a great number of potential discovery disputes that power would undoubtedly prove to be an extremely blunt and unwieldy, and hence impractical, instrument.[51]

Third. Rule 34 is a more manageable discovery mechanism than Rule 45 in a number of different respects. In the first place, under Rule 34, the parties proceed by

[only] to the court for resolution." The Federal Communications Commission did not submit a response in any form, consistently with its position that it will respond only to discovery subpoenas issued pursuant to Rule 45. See *discussion, at pp. 1334–1336, infra.* The United States Postal Service, which has taken a similar position, did file a response reiterating its view that absent a Rule 45 subpoena it is not legally required to respond to defendants' discovery demands, but that it would be willing to participate in discussions with defendants concerning production of necessary Postal Service documents.

**50.** See Rule 45(f). Possible sanctions for noncompliance with Rule 34 are far more flexible, *e. g.*, striking of pleadings, deeming certain matters to be established; precluding the use of particular items of evidence. Rule 37(b)(2), F.R.Civ.P.

**51.** Prof. Moore has noted (4 Moore's Federal Practice, para. 26.61[5.–1] pp. 26–287–89, ". . . where the government is not a party . . . the determination of the head of the department or agency that disclosure should not be allowed for all practical purposes has been final and unreviewable."

request, without leave of the Court; discovery is limited only by the relevancy requirements of Rule 26(b)(1), F.R.Civ.P.; and the Court becomes involved only when production is objected to or there is noncompliance. See Rule 37, F.R.Civ.P. While Rule 45 discovery is likewise initiated by request of a party, a subpoena will issue only through the Clerk under seal of the Court. Moreover, the person to whom the subpoena is directed may move to quash it on grounds that it is unreasonable or oppressive, even if the material is otherwise relevant within the meaning of Rule 26. See *Collins and Aikman Corp. v. J. P. Stevens & Co.*, 51 F.R.D. 219, 221 (D.S.C.1971); Wright and Miller, *supra*, Civil § 2457, pp. 433–4. When a department is considered a party, the scope of governmental privileges it may claim is narrower than when it is not. Cf. Moore's Federal Practice, *supra*, paras. 26.60[6], 26.61[6.–1]; *Fleming v. Bernardi*, 1 F.R.D. 624 (N.D.Ohio 1941); *United States v. General Motors Corp.*, 2 F.R.D. 528 (N.D.Ill.1942). Rule 45 could also be more expensive, since the Court may condition denial of a motion to quash upon an advancement of costs by the party on whose behalf the subpoena is issued. Rule 45(b)(2); *United States v. International Business Machines Corp.*, 62 F.R.D. 526, 528–9 (S.D.N.Y.1974); *Blank v. Talley Industries, Inc.*, 54 F.R.D. 627 (S.D.N.Y.1972). In this litigation, where defendants will have to undergo the expense of producing millions of their own documents, Rule 45 discovery might saddle them in addition with the expenses connected with the production of millions of documents from various government agencies.[52] Finally, the logistics of proceeding by subpoena against forty or more government agencies may be expected to be cumbersome. See, *e. g.*, *Freeman v. Seligson*, 132 U.S.App.D.C. 56, 82, 405 F.2d 1326, 1352 (1968).

Fourth. This litigation and its discovery phase are likely to be protracted, and there is no assurance that the voluntary commitments of the several agencies and departments, such as they are, will stand the test of time. Discovery will take many months at a minimum (pp. 1344–1346, *infra*), and it is not unlikely that demands will be made which some agencies and departments will find uncomfortable. The temptation to renege on or further to condition the present voluntary arrangement will then be great, and endless, multifaceted disputes and concomitant delays are likely to ensue.

For those reasons, defendants are entitled to a decision on their request for Rule 34 discovery, and hence the issue of who is the plaintiff in this case cannot be avoided.[53]

There is surprisingly little law on the question of whether, for discovery purposes in an action instituted in the name of the United States the plaintiff is the Department of Justice or some broader entity. There are a few scattered decisions in the criminal area, involving the discovery mechanisms recognized by the Jencks Act (18 U.S.C. § 3500) and by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which, while not dispositive,[54] are certainly instructive.[55] Typical of these criminal cases is *United States v. Bryant*, 142 U.S.App.D.C. 132, 140, 439 F.2d 642, 650

---

**52.** That this is a reality is borne out by the fact that the Postal Service has already indicated its intention not to produce the requested documents unless it is reimbursed by defendants.

**53.** Counsel for the government has suggested that this question be deferred until such time as logistical and other problems become so unmanageable that the "voluntary" system must be abandoned. The Court sees no purpose in temporarily avoiding a decision that eventually will have to be made in any case. A postponement of the decision would only prolong and exacerbate discovery disputes.

**54.** Section 2 of the Sherman Act establishes a criminal offense, but the section 4 enforcement provision here employed is civil in nature. Thus, this is a civil action.

**55.** The government acknowledges, indeed asserts, that "the role and responsibility of the antitrust prosecutor is analogous to that of the criminal prosecutor" (Status Memorandum, p. 31).

(1971), where the Court of Appeals for this Circuit, in a case involving possession of evidence by the Bureau of Narcotics and Dangerous Drugs, held that this evidence was producible under the Jencks Act because "the duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies." See also *United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973); *United States v. Ehrlichman,* 376 F.Supp. 29, 36, 389 F.Supp. 95, 97 (D.D.C.1974); *Christoffel v. United States,* 91 U.S.App.D.C. 241, 200 F.2d 734 (1952); cf. *United States v. Burr,* 25 Fed. Cas. 187, 191 (D.Va.1807).

The Department of Justice relies to the contrary[56] on such decisions as *United States v. Dansker,* 537 F.2d 40 (3rd Cir. 1976), and *United States v. Trevino,* 556 F.2d 1265 (5th Cir. 1977). However, it is apparent upon closer examination that these decisions do not support its argument. The documents involved in those cases were in the custody of probation officers, that is, agents of the court, rather than in that of officers of the Executive Branch. The most these cases can be said to stand for is that documents in the possession of the Judiciary or the Congress may sometimes be beyond the reach of criminal defendants (but see note 60, *infra*). However, the Department of Justice has produced nothing to suggest that, in criminal cases, the prosecuting entity can be anything less than the Executive Branch as a whole.

There is a paucity of authority on this issue in the area of civil litigation, and there certainly has been no instance of discovery being sought or required on as broad a scale, involving as many departments of government, as in this case. However, again, the few decisions more or less in point lend at least some support to defendants' position. See, *e. g., Harvey Alumi-* *num v. National Labor Relations Board,* 335 F.2d 749 (9th Cir. 1964); *United States v. IBM,* 60 F.R.D. 658 (S.D.N.Y.1973), appeal dismissed, 493 F.2d 112 (2d Cir. 1974) cert. denied, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); and *United States v. National Broadcasting Company,* 65 F.R.D. 415, 419 (C.D.Cal.1974), appeal dismissed, 421 U.S. 940, 95 S.Ct. 1668, 44 L.Ed.2d 97 (1975); cf. *United States v. ICC,* 221 F.Supp. 584, 589 (D.D.C.1963); *Equal Employment Opportunity Commission v. Los Alamos Contractors, Inc.,* 382 F.Supp. 1373, 1383 (D.N.M.1974).

■ Even aside from precedent, however, it is clear that the limited theory of the nature of the "plaintiff" advanced by the Department of Justice is unacceptable. This action, as its caption indicates, was brought not on behalf of the Department of Justice but on behalf of the United States of America. Civil enforcement proceedings pursuant to section 4 of the Sherman Act have traditionally been so instituted, presumably because the antitrust laws are of quasi-constitutional breadth and significance, and constitute a means for protecting the economic interests of the citizens of this country, not infrequently on a national scale. In the vindication of broad economic policy, it simply makes no sense to hold that the Department of Justice, which essentially is a law office, alone comprises the United States. An ambassador negotiating with a foreign government, the Secretary of the Treasury who authorizes the floating of a bond issue, a military contingent taking action on foreign soil—they all do so not on behalf of their respective departments but on behalf of this nation as represented by its government.[57]

The Attorney General, as the government's attorney and chief law enforcement

---

**56.** The government here opposes party production by other government departments, but in *United States v. IBM,* 69 Civ. 200 (S.D.N.Y.), an antitrust suit of comparable dimensions, it did not do so.

**57.** It is unnecessary here to explore such complicating factors as the role of the Congress in these various areas. At a minimum, these responsibilities are being carried out on behalf of the Executive Branch.

officer is, to be sure, the official responsible for instituting and conducting the criminal and civil litigation of the United States. But neither he, nor the department he heads (much less the Antitrust Division), is the United States. Indeed, the basic charter of the Department of Justice (28 U.S.C. § 519) carefully distinguishes between the Attorney General and the government by providing that ". . . the Attorney General shall supervise all litigation to which the United States . . . is a party. . . ." See also, ·28 U.S.C. §§ 501, 516–518.

Insofar as this case is concerned, it takes little speculation to conclude that it would not have been brought without consultation with government executives involved in economic policy and possibly with the White House itself, or without prior inquiry into the relationship between defendants and various government departments. Where that is true, it hardly seems reasonable to insulate the entire government, other than the Attorney General's Office, from the direct discovery process of Rule 34.

The theory of the government's case and the relief requested are national in scope and they are likely to involve the documents and the activities of a great number of government departments. Defendants have explained (Defendants' Status Memorandum, pp. 7–8) that "The principal purposes of defendants' document request were to show the extent to which the Bell System's structure and many of its practices are the result of the Government's own policies, the extent to which the Government, as the largest user of defendants' services, has benefited and continues to benefit from the Bell System's structure and practices, the extent to which the Government itself has recognized that the Bell System's horizontally and vertically integrated structure is vital to the nation's economy and to the national defense, the nature and extent of the regulation to which defendants are subject, the regulatory policies that have led to new entry into segments of the telecommunications industry. . . ." While the Court, of course, has not ruled on the relevance of specific requests or categories of requests for documents, it is apparent that defendants will need access to the records of many government agencies, and that fairness to them requires that such access be as unencumbered as the Federal Rules will allow.[58]

Plaintiff has expressed the fear that a precedent against its position here might encourage other litigants in other cases to rummage through the files of the entire government, and so paralyze both the work of numerous agencies and that of the courts. The short answer is that in the various respects described above, the instant case is relatively unique. The Court today holds only that on these peculiar facts, which involve massive and wide-ranging allegations, and in this peculiar action, which involves many departments and their evidence, the United States, having filed the action,[59] cannot claim to be merely the Department of Justice.

That conclusion does not end the inquiry, however, for not all of the agencies from which documents are being sought are directly a part of the Executive Branch. As noted, *supra*, at pp. 1332-1333, and in such cases as *Dansker* and *Trevino*, even in crim-

---

**58.** Counsel for the government have complained that a ruling equating all executive departments with the United States will complicate their task because they claim to have little influence over other agencies of the government. Obviously, defendants have even less influence over the agencies, and as the entities which have been sued, they are entitled to their discovery rights irrespective of the effect on inter-departmental relationships.

**59.** This suit was brought not against but by the United States. Compare *United States v. Reynolds,* 345 U.S. 1, 12, 73 S.Ct. 528, 534, 97 L.Ed. 727 (1953), where, in holding that a claim of privilege was not deemed waived in a Federal Tort Claims Act suit, the Court noted that the rationale of the criminal cases has "no application in a civil forum where the Government is not the moving party but is a defendant only on terms to which it has consented."

inal cases discovery does not always [60] reach the courts (and, for the same reasons, presumably not the Legislative Department). *A fortiori* civil discovery may be regarded as similarly limited. But a more difficult problem is raised by defendants' request under Rule 34 for documents in the possession of the Federal Communications Commission and other independent regulatory agencies. That request must be denied, for a number of reasons.

First. There is no basis for holding that a quasi-legislative agency, which the law necessarily regards as an independent body created to execute impartial regulatory responsibilities, becomes a "plaintiff" when the Department of Justice chooses to file a lawsuit on behalf of the United States.[61]

*Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), settled once and for all the character of such agencies. The Court's holding in that case may be summarized by its simple statement that "the Federal Trade Commission . . . cannot in any proper sense be characterized as an arm or an eye of the executive . . . and . . . [it] must be free from executive control" (295 U.S. at 628, 55 S.Ct. at 874). This principle is firmly rooted in our laws, and has been continually reaffirmed to the present day. See, *e. g., Buckley v. Valeo,* 424 U.S. 1, 132–6, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Planning Research Corp. v. Federal Power Commission,* 181 U.S.App.D.C. 33, 555 F.2d 970 (1977). As a study of regulatory agencies conducted last year by the Committee on Governmental Affairs of the U. S. Senate found:

> Critical to an understanding of the independent form is a recognition that the

agencies were intentionally created to be somewhat apart from the rest of the government, in general, and from the White House in particular. It was no accident: Congress wanted regulatory agencies that in fact were not capable of being fully integrated into the executive branch.

*Study on Federal Regulation* (Committee Print), prepared pursuant to S.Res. 71, Senate Committee on Governmental Affairs, 95th Cong., 1st Sess., Vol. 5, pp. 25, 30 n.17 (1977).[62]

The independence of the Federal Communications Commission from executive control is underscored by the fact that its Commissioners are appointed for fixed terms of seven years; that the terms do not all lapse at the same time; and that Commission members do not serve at the pleasure of the President. *Study on Federal Regulation, supra,* pp. 32–39. It is presumably also because of its independent status that the Commission's records are by law placed within the sole "custody" of the Secretary of the Commission. See 47 U.S.C. § 412.

Second. The plain fact is that a party cannot produce that which it does not have. Cf. *LaChemise LaCoste v. Alligator Company, Inc.,* 60 F.R.D. 164, 172 (D.Del.1974). In a very real, practical sense, the FCC's records are not in the control of either the Department of Justice or the Executive Branch. If, for example, the head of an Executive Department refused to produce documents required to assist the Department of Justice to prosecute this litigation to its conclusion, the Attorney General could then enlist the aid of the President, who, presumably, would direct their release. Yet, in view of the independent status of a

---

**60.** If, however, basic constitutional rights are involved, even the legislative and judicial branches may not be immune from process. See, *e. g., Christoffel v. United States, supra,* 200 F.2d at 739.

**61.** Regulatory agencies not infrequently take positions at odds with those of the Executive Branch. See, *e. g., Gordon v. New York Stock Exchange, supra; United States v. Interstate*

*Commerce Commission,* 221 F.Supp. 584 (D.D. C.1963).

**62.** In view of the quasi-legislative status of the Federal Communications Commission, a requirement that it produce documents as a party to an Executive Branch suit might well raise serious constitutional, separation-of-power problems.

regulatory agency such as the Federal Communications Commission, and the fact that its Commissioners are not subject to removal and therefore not to discipline by the President, the agency is essentially immune from executive direction.[63]

In short, both as a conceptual and as a practical matter, the Federal Communications Commission is free from executive control and not answerable to instructions from the President or the Attorney General.[64] To hold it to be a part of the "plaintiff" herein would not only contradict over forty years of legal history, but would effectively leave the conduct of this lawsuit, and perhaps of other actions brought by the government, vulnerable to a virtual veto by one or more independent regulatory agencies. See Rule 37, F.R.Civ.P.[65]

Third. There remains a definite possibility, as noted *supra*, at p. 1329, that one or more issues will be referred by the Court to the Commission under the doctrine of primary jurisdiction.[66] Treatment of the Commission as a party plaintiff might well be incompatible with its role as a decision-maker under that doctrine. Moreover, the Commission's responsibilities as the ongoing regulator of AT&T and its competitors cannot be ignored. The treatment of documents generated in the exercise of those responsibilities will require the utmost sensitivity—a treatment for which Rule 45 discovery is particularly well suited.

In memoranda submitted to the Court, the Federal Communications Commission indicated that it had "not closed the door on

---

**63.** *Harvey Aluminum v. NLRB, supra,* is not to the contrary. The court there was essentially concerned with Jencks Act statements in the possession of executive departments. The President was held to have adequate authority over such departments to procure production, and the courts to order it. The President lacks that capacity with respect to regulatory agencies and, while the courts' general power in that regard is not doubted, it is limited by considerations of legality and the appropriateness of its exercise under either Rule 34 or Rule 45, F.R.Civ.P.

**64.** Cases cited by defendants to the contrary are inapposite. *United States v. Reynolds, supra,* concerned Air Force records in a case in which the Justice Department was acting as attorney for the Air Force in defense of a tort claim. The Court recognized, *inter alia,* that the custody and control of the documents rested with the Air Force, and it did not require the Department of Justice to produce them. *United States v. Proctor & Gamble,* 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), involved grand jury transcripts under the control of the Justice Department itself. *Freeman v. Seligson, supra,* involved a subpoena directed to the Department of Agriculture which sought certain documents that had been furnished to the agency from individual commodity brokers. Neither these decisions nor the principles underlying them provide the slightest support for the proposition that an independent regulatory commission such as the FCC—as distinguished from an Executive Branch agency—is to be considered a party plaintiff in an antitrust suit. See *United States v. National Broadcasting Company,* 65 F.R.D. 415, 419 (C.D.Cal.1974), *appeal dismissed,* 421 U.S. 940, 95 S.Ct. 1668, 44 L.Ed.2d 97 (1975).

**65.** These considerations apply equally to the other independent regulatory bodies, from which defendants have sought discovery, such as the Federal Trade Commission and the Federal Power Commission. With respect to the status of the United States Postal Service, the parties have provided little assistance to the Court. However, it appears from an examination of present law that the Postal Service, as an "independent establishment" of the Executive Branch, should not be regarded as a party plaintiff for purposes of this suit. The Service is directed by a board of governors whose members serve staggered nine-year terms and may be removed only for cause (39 U.S.C. § 202); it has an independent financial structure; it has the statutory power "to sue and be sued in its official name" (39 U.S.C. § 401(1)); it controls its own records (39 U.S.C. § 401(4)); and it has been deliberately insulated from three types of political controls: (1) there is a ban on political appointments; (2) the Service is exempt from consideration of non-postal federal economic policies; and (3) the legislative history of the statute establishing the Service shows that, for reasons of efficiency and economy, it was intended to be insulated from legislative or executive control or interference. See 39 U.S.C. §§ 1002, 410(a); H.R.Rep. No. 91–1104, 91st Cong., 2d Sess. 5 (1970), U.S.Code Cong. & Admin.News 1970, p. 3649, 116 Cong. Rec. 21, 709 (1970).

**66.** Such a referral has repeatedly been sought by defendants themselves.

voluntary production" should defendants pare down their discovery requests to "reasonable levels, so that the FCC will not be unduly burdened and will not be asked to turn over obviously privileged material." FCC Memorandum of January 23, 1978, p. 17. In the context of one or a few independent regulatory agencies, without the distractions of forty other government agencies with their babel of differing views and interests on the production question, such voluntary cooperation is likely to prove practical and meet all the legitimate requirements of defendants. Should it ultimately prove that the Commission's response to requests from defendants is too niggardly, the defendants may always seek the assistance of the Court under Rule 45. The Court, on its own or through the Magistrate (see *infra*, p. 1348), stands ready to assist them to the full extent of its authority with respect to any legitimate requests.

## III

Discovery Order No. 2, entered by Magistrate Margolis on April 27, 1978, requires *inter alia* that defendants produce for inspection and copying all microfilm copies of documents, transcripts, and exhibits produced in connection with a number of antitrust actions brought by private parties against AT&T in other districts. Defendants have appealed this order to the Court, contending that, for a number of different reasons, such a requirement is inconsistent with the

spirit, if not the letter, of the Federal Rules of Civil Procedure.

It is appropriate initially to articulate precisely what is currently at issue between the parties with respect to Discovery Order No. 2. The order may be read to include three types of documents generated in seven other court proceedings: [67] (1) documents (or microfilm copies of documents) produced by AT&T to the private plaintiffs, and selected for use by the private plaintiffs, (2) documents produced by the private plaintiffs to AT&T, and (3) documents produced by third parties to AT&T, to the private plaintiffs, or to both. According to the United States, however, it seeks only those documents in the first of these three categories. Report for the United States concerning Magistrate's Order No. 2, filed June 7, 1978.[68] Moreover, it has actively pursued its request for production with respect to documents produced in only two of the other court proceedings. See note 91, *infra*. Thus, the question before the Court is whether defendants should be required in this proceeding to produce to plaintiff here copies of documents previously produced and selected for use in the lawsuits brought against defendants by Litton Systems, Inc. and MCI Communications Corp. in the Southern District of New York and the Northern District of Illinois, respectively.[69]

Defendants initially contend that the order constitutes an abuse of the discovery process, relying principally on *GAF Corporation v. Eastman Kodak Company*, 415

---

67. *Litton Systems, Inc. v. Am. Tel. & Tel. Co.*, No. 76 Civ. 2512 (S.D.N.Y.1976); *Marcom Inc. v. Am. Tel. & Tel. Co. and Pacific Telephone Co.*, Civil No. 43215 (N.D.Cal.1965); *MCI Communications Corp. v. Am. Tel. & Tel. Co.*, Civil No. 74 C 633 (N.D.Ill.1974); *Milgo Electronic Corporation v. Am. Tel. & Tel. Co., Western Electric, Southwestern Bell, Boeing Computer*, Civil Action No. 76–15–C2 (D.Kan.) (antitrust counterclaim only); *Morse Products Manufacturing Co. v. Am. Tel. & Tel. Co.*, No. 75–1704 (D.D.C.1975); *Northeastern Telephone Company v. Am. Tel. & Tel. Co., et al.*, Civil Action No. B 75 319 (D.Conn.); *San Antonio Telephone Co., Inc. v. Am. Tel. & Tel. Co., Inc.*, Civil No. SA–72–CA–330 (W.D.Tex.). The order also deals with documents produced or generated in three regulatory proceedings.

68. There is some dispute between the parties as to whether this constitutes a change in position by the government. For purposes of this appeal, it is irrelevant who is right on that issue.

69. Although counsel for defendants has stated that the government's attempt to obtain documents in this manner is unprecedented, in fact the same procedure was utilized by the government, albeit without objection, in the IBM litigation. See *United States v. International Business Machines Corp.*, 471 F.2d 507 (2d Cir. 1972); *International Business Machines Corp. v. United States*, 480 F.2d 293 (2d Cir. 1973).

F.Supp. 129 (S.D.N.Y.1976).[70] In the course of that antitrust case Eastman Kodak produced a great many documents, several thousand of which were produced· under a seal of confidentiality, and all of which—by agreement of the parties—were to be used "solely for the purposes of [that] litigation." Approximately three years after the lawsuit was begun, the Antitrust Division of the Department of Justice requested from GAF certain documents that GAF had received from Eastman Kodak by means of this discovery procedure. GAF then requested permission from the court to deliver the documents. Judge Marvin Frankel denied that request and entered a protective order prohibiting the transfer. He noted that although there was little precedent on the issue, the circumstances of the case, including, *inter alia,* the understanding between the parties, and the lack of assurances that the Department of Justice was not seeking the documents for the purpose of bringing a criminal action against Eastman Kodak, warranted the prohibition.[71]

While such a result may well have been appropriate in the context of the *GAF* circumstances, it is by no means dictated here.

In *GAF,* the government was not engaging in the discovery process as a party to that or any other litigation involving either GAF or Eastman Kodak. Quite the contrary, it sought the materials for investigatory purposes, presumably in anticipation of initiating a proceeding against Eastman Kodak.[72] Here, on the other hand, the government seeks the documents as a plaintiff in this litigation under the mechanism of Rule 34, F.R.Civ.P. As a defendant in this litigation, AT&T's duty to produce is squarely resolved by Rules 26 and ·34, F.R.Civ.P., which provide for the production of relevant documents within a party's possession, custody, and control. The documents here sought are, and always have been within defendants' possession, since they are defendants' own documents.[73] Conceptually it makes no difference under the Rules whether as such they represent the product of some process of selection worked out between the parties in the other actions or whether that process never took place.

Defendants here do not and cannot dispute that in the normal course of discovery in this litigation the government would be entitled to production of the same 12 mil-

---

**70.** Defendants also cite *Data Digests, Inc. v. Standard & Poor's Corporation,* 57 F.R.D. 42 (S.D.N.Y.1972); *In Re Coordinated Pretrial Proceedings in Western Liquid Asphalt Cases,* 18 F.R.Serv.2d 1251 (N.D.Cal.1974); *Aluminum Corporation of America v. United States Department of Justice,* 1978–1 Trade Cases 61,824 (D.D.C.1978); and *Martindell v. International Tel. & Tel. Corp.,* 72 Civ. 2609 (S.D.N.Y., March 23, 1978); *Wyly Corporation v. Am. Tel. & Tel. Co.,* Civil Action No. 76–1544 (D.D.C.1978); and the two decisions in *Zenith Radio Corp. v. Matsushita Electric Co., Ltd.,* 1978–1 Trade Cases 61,961 and 62,019 (E.D.Pa.1978). In none of these cases, however, did the government seek the discovery materials as a party to and for use in ongoing litigation. See notes 72, 73, *infra,* and accompanying text.

**71.** While Judge Frankel noted that, as a general proposition, the court should not sanction or encourage the use of private discovery to reinforce a government investigation preliminary to a civil or criminal prosecution, he was more concerned with "the use of private discovery as a possible supplement to federal grand jury proceedings." 415 F.Supp. at 133.

**72.** The court was understandably concerned that, by allowing the Antitrust Division, a stranger to the litigation, to enlist the assist-

ance of the private plaintiff, it would be adding a new and totally different method of investigation to the arsenal of devices granted to the Department of Justice by the Congress. Were the documents sought by way of a civil investigative demand (15 U.S.C. § 1312) or a grand jury subpoena, for example, there would be attendant safeguards on their production and use. By obtaining them through the good graces of plaintiff GAF, however, the government would have secured them free of the limitations that Congress saw fit to impose, and in a manner that Congress never intended.

**73.** The demand here is made in the context of an ongoing civil suit which has been proceeding in this Court for some four years. Whatever may be the propriety of turning litigation records over to the government to assist it with its investigations, there can be no legitimate objection to the use of such records in another, similar action in another district, particularly where, as here, the plaintiff is claiming violations of the antitrust laws by defendants similar to those that are claimed by the private plaintiffs in the other lawsuits. See notes 79, 80, *infra.*

lion pages of documents (subject to claims of relevancy and privilege) they produced in the Litton and MCI lawsuits.[74] What plaintiff is seeking to do is to obtain some lesser number of documents, perhaps some 2.5 million,[75] by eliminating for purposes of production in this case all those which the attorneys for Litton and MCI have already determined to be irrelevant. The only effect of the procedure requested by plaintiff, then, is to exclude the bulk of the records from even being considered for production here. The Court can find no basis for concluding that AT&T is suffering legal injury as a result of such a narrowing of the volume of the documents to be produced.

If anyone would have a legitimate complaint concerning this procedure, it would be the plaintiffs in the private lawsuits, who could conceivably assert a work product privilege. See generally, 8 Wright and Miller, Federal Practice and Procedure, Civil, § 2021 (1974).[76] Yet, not only have these plaintiffs not asserted that privilege, but they have affirmatively agreed with the procedure proposed by the government. Defendants have cited no authority for what would appear to be a startling proposition: that they may assert a work product privilege claim on behalf of their opponents in other lawsuits.

To be sure, to the extent that the government will not need to review the millions of documents generated by AT&T at the request of the private plaintiffs and may confine itself to the more limited number of records which those plaintiffs found useful, it will ease the government's discovery burden and speed this litigation along. But defendants have no legal interest in making the government's accumulation of proof more difficult or in delaying a trial on the merits. The intricacies of common law pleading and procedure, whereby a party could, through artifice, prolong litigation or avoid adjudications on the merits, have long given way to more sensible, merit-oriented processes. As one court has noted, "one of the purposes of the Federal Rules of Civil Procedure was to take the sporting element out of litigation, partly by affording each party full access to evidence in the control of his opponent." *Martin v. Reynolds Metals Corp.,* 297 F.2d 49, 56 (9th Cir. 1961). See also *Dienstag v. Bronsen,* 49 F.R.D. 327, 328 (S.D.N.Y.1969); *Hawes v. C. E. Cook & Co.,* 64 F.R.D. 22, 28–29, n. 3 (W.D.Mich. 1974). It would not advance but defeat the purpose of the Rules to require plaintiff in this case to proceed laboriously, and possibly at the cost of several years' delay, to duplicate the document selection process conducted by the plaintiffs in *Litton* and *MCI* when the fruits of that process are readily available and in the possession of a party to this very litigation, and when those who conducted the search do not object.[77]

Defendants next argue that unspecified portions of the requested documents might be irrelevant to this litigation, or privileged, and that therefore the Court may not order their production until (1) the government has made specific designations of classes of documents in terms of their relevancy to this action, and (2) the defendants have screened the documents to eliminate privileged materials. These contentions will be considered *seriatim.*

As regard specificity, defendants are of course correct in their assertion that Rule

---

**74.** Defendants' counsel has stated (Transcript of hearing of May 12, 1978, pp. 7–8): "We will take the microfilm, which is the selected copies of the documents that all the parties select, we will add to that all the paper we produced, that is, to those private parties, to the extent we can identify it—and by and large, 99 per cent of it, or so, we can identify; we know which files we produced—we will then produce to the government the underlying information, the document to the extent it is relevant in this case from all of this material."

**75.** It is estimated that defendants produced 7 million pages of documents in the *MCI* suit

from which plaintiff selected 1.5 million for copying; and 5 million pages in the *Litton* suit, from which plaintiff selected 1 million for copying.

**76.** It is, however, unclear whether the document selection process would constitute "work product" at all within the meaning of Rule 26(b)(3), F.R.Civ.P.

**77.** F.R.Civ.P. 1 provides that "these rules . . . shall be construed to secure the just, speedy, and inexpensive determination of every action."

34, F.R.Civ.P., requires that a party seeking discovery frame its request in terms of specifically designated relevant documents. But it is well settled that under the Rule "even a generalized description should be sufficient when . . . the party from whom discovery is sought will have no difficulty in understanding what is wanted." Wright and Miller, *supra*, Civil, sec. 2211, p. 634; *Roebling v. Anderson*, 103 U.S.App. D.C. 237, 257 F.2d 615, 620 (1958); *Mallinckrodt Chemical Works v. Goldman, Sachs & Co.*, 58 F.R.D. 348 (S.D.N.Y.1973). Since defendants have expressly acknowledged that they do know in fact what documents they produced in *MCI* and *Litton* (see note 74, *supra* ), they have no basis for their claim that the government's designation of documents is inadequately specific.

As regards relevancy, the government's request complies in substance, if not in form, with the requirements of the Federal Rules.[78]

In support of its discovery requests, the government asserts, and defendants do not deny, that the subject matter of this case virtually embraces the subject matter of *Litton* and *MCI*. A comparison of the complaint in this case (as amplified by the government's Preliminary Designation of Issues filed June 9, 1978) with the complaints filed in *Litton*[79] and *MCI*[80] reveals that none of the claims and issues involved in those cases is either foreign to or broader than the claims and issues raised in this case. If the government's request—instead of being couched in terms of a general request for the *Litton* and *MCI* documents—had been stated expressly in terms of the precise issues, claims, and transactions in those cases, defendants could hardly be heard to complain that the designation of documents was insufficient in terms of relevancy.

The only substantial difference between the claims and issues involved in the

78. Rule 26(b)(1), F.R.Civ.P., provides that "parties may obtain discovery of any matter, not privileged, which is relevant to the subject matter involved in the pending action."

79. The complaints here and in *Litton* are both directed to the activities of AT&T, Western Electric, Bell Labs, and the Bell Telephone Operating Companies that are named as co-conspirators. Both actions are based on a conspiracy by defendants to restrain trade and commerce in the telecommunications equipment market: the *Litton* plaintiffs claim defendants conspired to "restrain trade and commerce in the manufacture, distribution, sale, rental, and lease of telephone terminal equipment;" the government claims defendants conspired to illegally monopolize the "terminal equipment, switching equipment, and transmission equipment" market. In both cases the critical components of the alleged conspiracy are the prohibition of interconnection with the Bell System, or its permission only with the restriction of a so-called "interface device" manufactured by Western Electric, and supplied only by Bell companies; an illegal agreement that Western Electric shall manufacture all the telecommunications equipment requirements of the Bell System, thereby restricting and eliminating competition from other manufacturers and suppliers of telecommunications equipment. See also note 80 *infra*.

80. The complaint in *MCI* alleges that AT&T, along with the same twenty-four Bell Telephone Operating Companies involved here (and one additional company, Bell Telephone of Ne-

vada) conspired to prevent plaintiffs, who are specialized communications common carriers, from interconnecting in the intercity telecommunications services market; that they provided for interconnection in that market only upon discriminatory terms and conditions; and that they refused to allow plaintiffs to utilize AT&T's most efficient equipment and facilities. Similarly, the complaint here alleges that defendants and their co-conspirators conspired to monopolize the market of "intercity private line service for the transmission of voice, data, facsimile, audio and video programming, and other telecommunications," by *inter alia* attempting to obstruct and obstructing the interconnection of specialized common carriers with the Bell System; and that they used their monopolistic position to deter "would be competitors" in that market "by refusing to deal with them . . . or did so only on highly discriminatory terms and conditions." Both plaintiffs allege that in furtherance of the conspiracies, defendants abused the administrative process by filing "sham tariffs;" engaged in predatory and exclusionary pricing tactics and "tracking" of competitors (offering to provide services in the same areas as private systems but at substantially lesser rates); and refused to provide access for private systems to utilize Bell System facilities. Thus the parties, the critical components, and the activities that each plaintiff purports to rely on to demonstrate the conspiracy are essentially the same in both cases.

government's case here on the one hand, and those involved in the *Litton* and *MCI* cases on the other hand, is that the former subsume the latter. In effect, *Litton* and *MCI* each represent a separate and identifiable segment of the government's case here. Thus, *a fortiori,* the documents relevant to those actions would be relevant here; their relevancy is further assured by their having been thoroughly screened for relevancy in the private actions.

■ To be sure, neither the confluence of issues in the private lawsuit with those in this lawsuit, nor the findings of relevancy made in those private actions, are determinative, and some of the documents produced by AT&T in *Litton* and *MCI* may ultimately be found to be outside the range of relevancy within the meaning of this action. But the discovery rules do not require absolute precision, and no order of production can serve as a guarantee that every document produced will be relevant.[81] If the purposes of the Rules, and of pretrial discovery generally are to be effectuated, actual discovery must be expected to be somewhat of a "fishing expedition,"[82] particularly in antitrust and similarly complex litigation.[83]

It is difficult to envision what prejudice could ensue from the production of documents, a small number of which might turn out not to be relevant to this lawsuit. To the extent that any irrelevant documents are produced, defendants will be amply protected by this Court's protective order, which will maintain the confidentiality of all documents produced, and order the return of any irrelevant documents to the defendants.[84]

81. As Judge Irving Kaufman has pointed out (Kaufman, Judicial Control Over Discovery, 28 F.R.D. 111, 119 (1961)); "The clear policy of the rules is toward full disclosure. At the early stages of litigation, it is rare that a showing can be made that a particular item of requested information is not 'relevant' under the broad definition given that word in Rule 26. In the ordinary case, the judge will order the question to be answered, subject to a later finding of irrelevancy. . . . " See also, *Metal Foil Prod. Mfg. Co. v. Reynolds Metals Co.,* 55 F.R.D. 491, 493–4 (E.D.Va.1970); *E. I. duPont de Nemours v. Deering Milliken Research Corp.,* 72 F.R.D. 440, 442–3 (D.Del.1976); *Horizons Titanium Corp. v. Norton Co.,* 290 F.2d 421, 425 (1st Cir. 1961); *Patterson Oil Terminals, Inc. v. Charles Kurz and Co.,* 7 F.R.D. 250, 251 (E.D.Pa.1945); *Heiner v. North American Coal Corp.,* 3 F.R.D. 63 (W.D.Pa.1942).

82. *Hickman v. Taylor,* 329 U.S. 495 at 507–8, 67 S.Ct. 385, 91 L.Ed.2d 451 (1947); *Laverett v. Continental Briar Pipe Co., Inc.,* 25 F.Supp. 80, 82 (E.D.N.Y.1938); *Mattson v. Cuyuna Ore Co.,* 178 F.Supp. 653, 654 (D.Minn.1959); see also Advisory Committee Report, 5 F.R.D. 433, 454 (1946); *Harris v. Nelson,* 394 U.S. 286, 297, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969); *Democratic National Committee v. McCord,* 356 F.Supp. 1394, 1396 (D.D.C.1973); see generally, Wright and Miller, *supra,* Civil, sec. 2007.

83. See, *e. g., United States v. International Business Machines Corp.,* 66 F.R.D. 180 (S.D.N.Y.1974); *Goldlinger v. Boron Oil Co.,* 60 F.R.D. 562 (W.D.Pa.1973); *Parion Theatre Corp. v. RKO Theatres, Inc.,* 319 F.Supp. 378 (S.D.N.Y. 1970); *G. & P. Amusement Co. v. Regent Theater Co.,* 9 F.R.D. 721 (N.D.Ohio 1949).

84. It is also noteworthy that the documents in question were produced to the plaintiffs in the private lawsuits in bulk, without any concern for relevancy or privilege, and with provision for determination of these matters only subsequent to production. Defendants have suggested that such a free and open attitude was appropriate to the parties in the private cases because (1) those parties, unlike the government, could be trusted not to "leak" material to unauthorized persons, and (2) strong protective orders were issued in those cases. This Court has issued a protective order (Pretrial Order No. 7) which guarantees defendants' rights at least as securely as did the protective orders in *MCI* and *Litton;* and, the Court is prepared to impose such additional safeguards as may, from time to time, appear reasonably necessary to protect defendants' interests in this regard. The Court cannot accept the proposition that government counsel will be more likely than others to violate those protective orders and to reveal materials the disclosure of which is prohibited. Further, defendants' contention that the Publicity in the Taking of Evidence Act, 15 U.S.C. § 30, will somehow hamper the Court's ability to provide protection for privileged documents is unfounded. See *United States v. United Fruit Company,* 410 F.2d 553, 555–56 (5th Cir. 1969). The Act provides only that depositions taken pursuant to a Sherman Act claim brought by the United States are to be conducted in public, and has no bearing on the government's right to obtain documents. If and when the government properly raises the issue of production of deposition transcripts from the two private cases (see note 91, *infra* ), the Court will hear from the parties as to the possible effects of the Act in that context.

This Court is not required to compel plaintiff to engage in a time-consuming re-enactment of the discovery process engaged in by the *Litton* and *MCI* plaintiffs, with the result that eventually, that is, several years later, essentially the same documents will be produced. The Court clearly has the authority under the Federal Rules to order production of documents which are—on any reasonable interpretation of that concept—relevant, and through a process which fully protects the legitimate interests of defendants.[85] There is no basis in the law or common sense to prescribe the more cumbersome procedure.[86]

This, then, leaves only defendants' claims as to privilege. In this regard, defendants are entitled to a mechanism (1) for honoring appropriate claims of privilege and (2) for insuring, by means of an appropriate protective order, that any privileged documents produced to plaintiff will not be used improperly. On December 16, 1976, the parties stipulated to and the Court approved such a mechanism in this proceeding in Pretrial Order No. 7. This order is presently in full force and effect, and provides *inter alia,* that:

> WHEREAS, the need for prompt and orderly discovery is not inconsistent with the ability of parties to make some examination to determine whether documents and other discovery materials are protected, privileged, or work product, but may make it impossible for them to conduct such examination on a sufficiently thorough basis to ensure that their rights are fully protected with respect to such documents and other discovery materials.
>
> . . .
>
> \* \* \* \* \* \*

NOW IT IS HEREBY ORDERED THAT:

\* \* \* \* \* \*

3. All documents and other discovery materials encompassed within any document request or interrogatories as to which a claim of privilege or work product is asserted by any party shall be regularly referred at reasonable intervals to the Special Master during the production of documents for a decision as to whether or not said documents or materials must be produced and under what conditions.

4. The production of any document or other discovery material by plaintiff or defendants under this Order shall be without prejudice to any subsequent claim that such material is immune from discovery by reason of law or statute, privileged under Rule 26 of the Federal Rules of Civil Procedure, or protected from discovery as work product within the meaning of Rule 26 of the Federal Rules of Civil Procedure; and no party shall be held to have waived any such rights by such production. Any document or other discovery material produced to an opposing party with respect to which a claim of privilege or work product is subsequently made shall be returned forthwith to the Special Master for determination of the legitimacy of the claim and all copies thereof shall be returned to the party producing the same.

The order expressly contemplates that "because of a need for prompt and orderly discovery" not all claims of privilege will be asserted prior to or at the time documents are produced, and it therefore reserves to the parties the right to assert claims of privilege in appropriate instances subsequent to production. It further provides a

---

**85.** See *Huff v. N. D. Cass Co. of Alabama,* 468 F.2d 172 (5th Cir. 1972); *Bell v. Swift & Co.,* 283 F.2d 407 (5th Cir. 1960) (trial judge's rulings on discovery matters will not be disturbed in the absence of "substantial prejudice.") See generally, *Rodgers v. United States Steel Corp.,* 536 F.2d 1001, 1006 (3rd Cir. 1976); *Galella v. Onassis,* 487 F.2d 986 (2d Cir. 1973).

**86.** Defendants' contention that requiring them to turn over these documents to plaintiff places

them at a discovery disadvantage is without merit. AT&T is also the defendant in the *Litton* and *MCI* cases, and as such, has had the same opportunities for discovery as did the private plaintiffs in those suits. To be sure, some of AT&T's discovery in the private suits may not prove useful to it in this case but, of course, some of *MCI's* and *Litton's* discovery may not be of use to the government either.

comprehensive scheme for treatment of privileged documents that fully protects against their improper use or disclosure by either party. Inasmuch as there is presently a clear need for prompt and orderly discovery, this stipulation and order would seem to have been tailored for precisely the situation in which the parties find themselves now.

Accordingly, the Court has this day entered Pretrial Order No. 11 which requires defendants to produce by November 1, 1978, all of the approximately 2.5 million documents produced by them in *Litton* and *MCI* and selected for use by those private plaintiffs. Documents as to which defendants wish to assert a claim of privilege are to be segregated[87] and delivered to the Special Masters by that date.[88] To the extent that

defendants are unable to determine by that date all claims of privilege they wish to assert, they shall, in the manner prescribed in Pretrial Order No. 7, deliver the documents to plaintiff and assert appropriate claims of privilege subsequently.[89] Pretrial Order No. 11 further directs plaintiff to bring this Order to the attention of the U.S. District Court for the Southern District of New York and the U.S. District Court for the Northern District of Illinois, and to request leave[90] from those courts for the production of such documents notwithstanding any protective orders that may have been entered therein.[91]

## IV

The complaint herein was filed in November of 1974, and the answer in February of

---

87. Since defendants have claimed that segregating some privileged material from non-privileged material will be impractical or impossible due to the fact that the government has requested the material to be produced in the form of microfilm, they may produce documents in their original form where they determine that to be necessary. However, such determinations are to be made in good faith, and production of documents in their original form is to be the exception and not the rule. The Court notes in that regard that in the *IBM* litigation, under almost identical circumstances, the defendant was able to remove documents which it was claimed were privileged from the reels of microfilm delivered to the government. See Note, "Ancillary Pretrial Orders," 73 Colum.L. Rev. 1660, 1661 (1973).

88. Those documents which were ruled to be privileged in *MCI* and *Litton,* either by Special Masters in those cases or otherwise, will be segregated and deemed provisionally privileged here until such time as the Special Masters in this case rule on their status in accordance with standards of privilege established in this case.

89. Since defendants have repeatedly indicated to the Court that all confidential and privileged documents produced by them in *Litton* and *MCI* were specially marked with a confidential legend, segregation of most—if not all—of the documents requested here should be possible by the date indicated. Moreover, defendants have the benefit of the rulings of Special Masters in those cases to assist them in determining which documents should be claimed as privileged here.

90. While technically such leave may not be required inasmuch as defendants are merely being ordered to produce documents relevant

to this lawsuit which are in their possession and control, as a matter of comity and courtesy the procedure described herein should be followed.

91. Although the government has not completely abandoned its request for documents from the remaining five private actions and the three regulatory proceedings to which AT&T is a party, it has concentrated its efforts on those produced in *Litton* and *MCI.* The parties have essentially briefed and argued the issue only with respect to these two proceedings, and the Court has not been made aware of either the protective order situations or substantive issues involved in the other proceedings. Accordingly, the present orders are limited to the two civil actions which have generated the bulk of this kind of discovery sought by plaintiff. Should the government desire to press its request for documents produced in other private lawsuits or regulatory proceedings, it may do so by special application showing the precise circumstances which establish the appropriateness and necessity of ordering their production. Insofar as copies of the depositions taken in any of the private lawsuits (including *Litton* and *MCI*) and the documents attached to the depositions, are concerned, considerations other than those which pertain to the documents may well be present yet the government has made no effort to provide the Court with either a legal or factual basis on which to order their production. With respect to the depositions, therefore, the government's request is likewise denied without prejudice to a subsequent submission of an appropriately-supported application.

1975. During the three and one-half years since then, all proceedings were effectively halted for a total of 31 months, first by a stay issued by this Court on February 27, 1975, which expired on December 16, 1976, and then by two stays issued by the U.S. Court of Appeals (while defendants were proceeding by way of writ of certiorari from the Court's order of November 24, 1976)—from January 25, 1977, to May 27, 1977, and from August 11, 1977, to November 28, 1977. During the infrequent periods—lasting no more than a few months at a time—when the proceedings were not under a stay order, relatively little discovery was being carried on. Thus, in spite of its age, this case has not come close to going to trial.

The delays until now, while certainly regrettable, cannot be regarded as either purposeful or unnecessary. In view of the importance of the issues involved, the defendants had the right to seek review of the rulings of this Court from appellate tribunals; the stays ordered by this Court and the U.S. Court of Appeals were appropriate to preserve the status quo; and the slowdown of discovery activities cannot be regarded as unexpected while significant issues having a potentially decisive bearing upon the proceedings in this case were under consideration. Thus, while the parties in their respective memoranda submitted to this Court in anticipation of the status hearing on August 21, 1978, have repeatedly, and with perhaps unnecessary acerbity, blamed each other for intentional delaying tactics, the Court has neither desire nor cause to cast blame upon either party for the delays that have occurred until the present.

However, in view of the Court's decision today on all major outstanding issues, the time is ripe for sketching out a procedural plan to move this litigation expeditiously along toward its disposition without doing violence to the legitimate rights of the parties. Defendants point out in their reply to the government's status memorandum that delay in this case "is an incredible burden to the Bell System involving as it does a cloud over its entire future existence and the need to divert vast resources, both in the form of financial expenditures and in the diversion of personnel critically needed in the provision of service to the public." [92] Likewise, if the government's charges of a vast and unlawful monopoly in the telephone and telecommunications area are correct, it, and the public, have an interest in seeing to it that appropriate remedial action is taken at the earliest opportunity.

The complaint, as defendants have pointed out, is sweeping, broad, and vague. This has not only had the effect of making it difficult for defendants to formulate their defenses,[93] but it has also been an obstacle to discovery. Absent greater precision and specificity with respect to the government's claims, discovery is likely to remain so unfocused as to be both unduly expensive and unmanageable. Moreover, it is generally agreed that one key to the swift disposition and firm management of cases such as this is a narrowing of the issues.[94] Thus, it is essential that this relatively amorphous complaint be shaped as quickly as possible into specific allegations, and that a continuing mechanism be established for identifying and narrowing the issues and specifying the evidence to be relied upon by both plaintiff and defendants.

After considering defendants' request for greater specificity,[95] plaintiff's offer to sub-

---

**92.** Status Memorandum, p. 43, footnote.

**93.** To date, the government has done nothing more than to file a Preliminary Designation of Issues, on June 9, 1978, which provided, in the government's own words, "a brief, preliminary and somewhat tentative overview of the 'issues' before the court."

**94.** See, e. g., Moore's, *supra, Manual for Complex Litigation*, para. 1.20; J. Withrow and R. Larm, *The "Big" Antitrust Case: 25 Years of Sisyphean Labor*, 62 Cornell L.Rev. 1, 42–3 (1976); Comment, *Federal Civil Procedure—*

*Federal Rule 16—Definition of Issues by the Pre-Trial Judge*, 61 Mich.L.Rev. 1566 (1963); Comment, *The Role of the Court in Simplifying the Triable Issues at Pretrial Conference*, 72 Yale L.J. 383 (1962); Proceedings of the Seminar on Protracted Cases, 21 F.R.D. 395 (1958).

**95.** Defendants have repeatedly requested greater specification of the charges against them, and while their requests have generally been made in the context of the jurisdictional issue, now disposed of in Part I, *supra*, the principle of such a specification is sound.

mit a preliminary order of proof,[96] and the need for expeditious processing of this litigation and an appropriate limitation on discovery, an order to govern pretrial proceedings (Pretrial Order No. 12) [97] is being entered this date.[98]

In essence, that order provides that the parties shall file four successive Statements of Contentions and Proof over the next eighteen months, each to become progressively more specific than the last, and each to be followed by a special pretrial conference. The filing of the final statements shall signal the close of discovery.

Thus, by November 1, 1978, plaintiff shall file a Statement of Contentions and Proof, in which it shall describe, with specificity, each of the government's legal and factual contentions, including the activities of the defendants it expects to rely upon to prove its charges of violation of Section 2 of the Sherman Act. Under the heading of each factual contention, the statement shall list the witnesses and the documentary and other evidence [99] which will be used to support the claim that such activity was carried on to effect unlawful combinations in violation of the antitrust laws, or which will otherwise support the allegations of the complaint. The statement shall describe the extent to which such evidence is presently in the possession of the plaintiff, or where, in the government's view, it may be found.

 Defendants shall then have until January 1, 1979, to file their first Statement of Contentions and Proof in which they shall state their factual and legal contentions in response to plaintiff's claims, the factual and legal basis for their affirmative defenses, if any, and the documentary or other proof they expect to rely upon in support of each factual contention. Defendants' statement shall be organized in a manner similar to that of plaintiff and it shall be similarly detailed.

Within thirty days thereafter, a special pretrial conference [100] shall be held before the Magistrate [101] in accordance with Rule 16, F.R.Civ.P. and 28 U.S.C. § 636, for the principal purposes of narrowing and simplifying the issues,[102] arriving at stipulations of uncontroverted facts, and reducing further unnecessary discovery.[103]

96. The government has stated that to sharpen the issues, it will be prepared to submit what it refers to as a preliminary order of proof (although it is not quite clear what it means to include in that order of proof), and the Magistrate included a requirement for the submission of such a document in his Discovery Order No. 2.

97. This order may be regarded as only the first of several directions from the Court concerning pretrial procedures. It is expected that, as discovery proceeds, additional orders will be entered, upon the Court's own motion or at the suggestion of the parties, to further simplify and streamline this case.

98. The order is based on the Court's authority under Rules 16 and 26, F.R.Civ.P. At the same time, the Court recognizes that in a lawsuit of this magnitude, pretrial mechanisms must not merely follow the literal language of the Rules but should also take account of the logistics of dealing with proof of potentially enormous proportions. See also, *Rosden v. Leuthold*, 107 U.S.App.D.C. 89, 274 F.2d 747 (1960); *Buffington v. Wood*, 351 F.2d 292 (3rd Cir. 1965); *Davis v. Duplantis*, 448 F.2d 918 (5th Cir. 1971); *Walker v. West Coast Fast Freight, Inc.*, 233 F.2d 939 (9th Cir. 1956). See also, *United States v. E. I. Dupont De Nemours & Co.*, 10 F.R.D. 618 (D.Del.1950); *Gaylord Shops v.*

*South Hill Shoppers City*, 33 F.R.D. 303 (W.D. Pa.1963).

99. Except for massive documentary evidence supporting particular contentions which may be referred to generally, all evidence is to be described in specific terms.

100. This will be first of four special pretrial conferences to be held in addition to routine pretrial conferences and meetings.

101. The Magistrate will be expected to keep the Court advised concerning the pretrial conferences and the progress of discovery which he will direct and monitor. See generally, Note, *Masters and Magistrates in the Federal Courts*, 88 Harv.L.Rev. 779, 802, n. 147 (1975).

102. Including such matters as limitations on the scope and the period of inquiry. See Prettyman Report, 13 F.R.D. 62, 73-4 (1952).

103. See *Dolgow v. Anderson*, 53 F.R.D. 661, 664 (E.D.N.Y.1971); *Life Music, Inc. v. Edelstein*, 309 F.2d 242 (2d Cir. 1962); A. Ridge, *The Organization of the Big Case*, 21 F.R.D. 406 (1957); Manual for Complex Litigation (Moore's Fed. Practice, 1977), para. 0.40.

■ Each of the parties shall file three additional Statements of Contentions and Proof, and three additional special pretrial conferences shall be held successively thereafter, as follows. The government shall file its second, third, and fourth statements by April 1, 1979, October 1, 1979, and April 1, 1980; defendants shall file their second, third, and fourth statements by May 1, 1979, November 1, 1979, and April 1, 1980;[104] and special pretrial conferences shall be held on or about June 1, 1979, December 1, 1979, and May 1, 1980.[105] Some of these pretrial conferences, particularly the later ones, may be conducted by the Court rather than the Magistrate. On April 1, 1980, contemporaneously with the submission of the final statements, all discovery shall be closed.

[17] If the issues are to be narrowed and this case is to be brought to trial within a reasonable period of time, it is essential that the parties be bound by their Statements of Contentions and Proof. Accordingly, after a party has filed a statement, it will be restricted to discovery within the limitations of the issues identified by that statement and the contemporaneous opposing statement. Likewise, with the exceptions noted below, subsequent statements may not enlarge upon or add to contentions previously made, and they will have as their purpose not the inclusion of matters neglected or overlooked in earlier statements,

but the further narrowing and tightening of matters in dispute between the parties.

■ Discovery will also be restricted to data relevant to proof of propositions which are material, as distinguished from merely generally relevant conduct, periods of time, or areas (see *Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 374 F.Supp. 1080, 1101 (D.Minn.1974); *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.*, 373 F.Supp. 1225, 1229 (S.D.N.Y.1974); *Dolgow v. Anderson, supra*), and proof at trial will be limited to the issues framed by the final statements and the last pretrial order.[106]

To be sure, in the early stages of this process the parties may not be able to be fully definitive as to either the evidence or the specific contentions that will be based on that evidence.[107] Accordingly, upon leave of the Magistrate, which will be freely granted with respect to a request based upon new discovery, the second statement may enlarge upon the first, either by broadening existing contentions or by adding new contentions. Cf. Rule 15, F.R.Civ.P.[108] Thereafter, however, the burden to justify a departure from previous statements shall become progressively heavier. After the parties file their second statements, an enlargement will be allowed only upon good cause shown, and after the third statements are filed, any amendment, other than by

---

**104.** At the present stage of the proceedings, defendants may be expected to require some time to respond to the government's contentions. As discovery proceeds and the issues become more clearly defined, defendants will appropriately be able to submit their statements more or less contemporaneously with those filed by plaintiff.

**105.** This schedule does not preclude the entry of orders for filing additional Statements of Contentions and Proof, or any other mechanisms for further narrowing the issues and limiting discovery. The Court will employ the sanctions available under Rule 37, F.R.Civ.P., and 28 U.S.C. § 1927, to insure prompt compliance with the pretrial procedures specified herein and in the accompanying orders. See generally Edelstein, *The Ethics of Dilatory Motion Practice: Time For Change*, 44 Fordham L.Rev. 1069 (1976).

**106.** See, generally, Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 386–390 (1960); A. Dawson, The Place of the Pleading in a Proper Definition of Issues in the "Big Case," 23 F.R.D. 430 (1958); A. Ridge, *The Organization of the Big Case, supra*, note 98; 1 Moore's Federal Practice, *supra*, Manual for Complex Litigation, para. 1.20, 1.80, 2.30, 2.40, 3.30, 3.60, 4.20, 4.57 (1977); 3 Moore's Federal Practice, *supra*, para. 16.20 (1977).

**107.** The Court notes, however, that counsel for the government stated during the oral argument on August 21, 1978, that he expects no broadening whatever of the issues after the first "order of proof" is filed.

**108.** Similarly, prior to the filing of the second statement, discovery will not be restricted by the parameters of the issues defined by the first statement.

way of limitation, will be granted only to prevent manifest injustice. *Shuber v. S.S. Kresge Co.*, 458 F.2d 1058 (3rd Cir. 1972); *Solar Fuel Co. v. United Mine Workers*, 346 F.Supp. 789 (W.D.Pa.1972); 3 Moore's Federal Practice, *supra*, p. 1620; and see generally, J. Withrow and R. Larm, *The "Big" Antitrust Case: 25 Years of Sisyphean Labor, supra*, 62 Cornell L.Rev. at 26. These procedures will be enforced and administered to achieve a narrowing of the issues,[109] to apprise opponents and the Court of the status of the case, and to effect appropriate limitations on discovery.

To a substantial extent, the development of discovery and the definition and clarification of issues present a classic "chicken and egg problem," *i. e.*, "to be manageable, discovery ought to be confined to framed issues, but to be framed carefully, issues must be based on concrete knowledge." Antitrust Commission, *Briefing Paper on Expediting Complex Antitrust Cases*, p. 15; 62 Cornell L.Rev., *supra*, at 27. The authorities differ on how this dilemma should be resolved, that is, in what sequence and by what methods discovery and issue definition should take place. Some writers advocate that, in order to avoid the unnecessary production of documents and the taking of depositions which ultimately may not prove to be helpful, all discovery should be stayed until the issues have been clearly specified. See, *e. g.*, 21 F.R.D. 395, et seq., Handbook of Protracted Cases (1958); R. McLaren, *Procedure in Private Antitrust Cases*, 21 F.R.D. 440, 446–47 (1957); and see generally, R. Savage, *Limiting Discovery and Definition of Issues*, 23 F.R.D. 456, 457–60 (1958). The highly respected Manual for Complex Litigation, on the other hand, takes the position that the issues cannot be defined until all discovery has more or less

been completed; 1 Moore's Federal Practice, *supra*, para. 1.20; 1.70.

In my judgment, in a suit of this magnitude it would be self-defeating either to let discovery continue on an almost unlimited basis, until the parties are prepared fully to define the issues, or to freeze discovery indefinitely in the illusory hope that the parties—without the benefit of discovery—will somehow acquire the capability to give concrete shape to the generalized issues raised by the complaint and the answer. Either course can lead only to procrastination. The short of the matter is that "the need to settle every conceivable dispute and to have every conceivable theory and fact presented must be balanced by the need for final resolution." 62 Cornell L.Rev., *supra*, at 24.[110] The procedures specified herein are designed to move the case along while seeking to escape the adverse consequences inherent in the several contending methods of handling the pretrial process. Discovery and issue definition will go hand in hand. Initially this will entail a certain amount of discovery that will have to be disregarded later—but as the issues are narrowed further, less and less irrelevant discovery should take place. Concomitantly the ongoing discovery process should provide the information necessary to narrow the issues.

If mutually fair, appropriately complete, and expeditious discovery is to be effected, and if the real issues are to emerge at an early date, it is essential that the parties cooperate in good faith with each other, the Magistrate, the Special Masters, and the Court. Counsel will be expected to meet informally with each other whenever appropriate to attempt to iron out discovery disputes, and only when controversies are so genuine and substantial that they cannot be

**109.** See *Life Music, Inc. v. Broadcast Music, Inc.*, 31 F.R.D. 3 (S.D.N.Y.1962); *Brinn v. Bull Insular Lines, Inc.*, 28 F.R.D. 578 (E.D.Pa.1961).

**110.** See also, *United States v. Standard Oil Company (New Jersey)*, 23 F.R.D. 1 (S.D.N.Y. 1958). In that complex antitrust case, the court ruled that discovery should proceed to the extent necessary to provide sufficient information for a narrowing of the issues, noting

that "[a]fter such preliminary narrowing, the balance of discovery can be measured against the frame of reference of the issues, as so narrowed, rather than against the broad frame of reference of the complaint which is the only one presently available. After the narrowing of the issues, much of the production presently sought might be determined not to be necessary." 23 F.R.D. at 4.

resolved informally shall they be submitted to the Court.[111]

The parties are in agreement that the details of discovery must be closely supervised by a judicial officer if this case is to move expeditiously to a disposition on the merits. There is some difference of opinion as to whether these supervisory functions would best be exercised by the Court, the Magistrate, or the Special Masters and, indeed, to what extent some of these functions have previously been delegated to the Magistrate and the Special Masters.

An order issued by the Court on February 7, 1978, provides in part that "the Court . . . will assign the case to Magistrate Margolis to direct the preparation of the pretrial discovery schedule and to perform such additional duties with respect to discovery and other matters as the Court may direct pursuant to 28 U.S.C. § 636(b) and Local Rules 3–8 and 3–9."

The government has construed this order to mean that all discovery matters in this case were referred to the Magistrate for ongoing supervision and review, and Magistrate Margolis, as his Discovery Order No. 2 bears out, shares this view. Defendants, on the other hand, understand the February 7, 1978, order to mean that, except for the preparation of a discovery schedule, the Magistrate has no authority with respect to discovery or any other pretrial matters. Defendants recommend instead that the Special Masters, appointed pursuant to Pretrial Order No. 7, be utilized for resolving discovery disputes likely to arise in this case.

This Court concurred with Judge Waddy when he designated Professors Rice and Hazard to serve as Special Masters. Under the order of reference, they have the responsibility for ruling on all claims of work product and other privilege asserted during the course of discovery. The Court is fortunate that these distinguished scholars have agreed to undertake this task, and it is fully committed to support them in the exercise of their duties.[112]

 At the same time, it appears that broadening the responsibilities of the Special Masters to include ruling on all discovery disputes, as suggested by defendants, would be inappropriate. The Special Masters will have an enormous responsibility, with respect to both volume and sensitivity, in passing upon claims of privilege advanced by defendants and many government departments. Moreover, each of the Special Masters is carrying a full teaching load, while the Magistrate has no additional responsibilities other than those arising out of litigation in this Court. The Magistrate, unlike the Masters, has his office in this courthouse where he may be deemed to be available both to the parties and to this Court at all times.[113] Further, the legislation creating the post of Magistrate contemplated that persons occupying the position would undertake precisely such responsibilities.[114]

111. In some jurisdictions, local rules explicitly provide that counsel shall discuss their discovery differences before bringing them to the court. See, e. g., D.C.Cal.R. 3(1); D.Minn. R. 5; see generally 62 Cornell L.Rev., *supra*, at 30.

112. A dispute has arisen between the parties concerning the appropriate division of expenses with respect to the work of the Masters and their staffs, with the government taking the position that it should not be responsible for costs to the same extent as defendants. The Court has entered an order (Pretrial Order No. 9) requiring the parties to bear costs equally pending a further order at some future date when, because of a disposition on the merits, an allocation of workload, or otherwise, a different distribution of costs will be appropriate.

113. Professor Rice is a Professor of Law at Washington College of Law, American University in Washington, D. C.; Professor Hazard is a Professor of Law at Yale University School of Law in New Haven, Connecticut. At least for the time being, their staffs for purposes of this litigation will be located in Bethesda, Maryland.

114. See, Report of the Committee on Procedure in Antitrust and Other Protracted Cases, 13 F.R.D. 62 (1951); Yankwich, "Short Cuts in Long Cases," 13 F.R.D. 41, 83 (1951); Federal Magistrates Act, 28 U.S.C. §§ 631–639, and see, Note, Masters and Magistrates in the Federal Courts, *supra*, 88 Harv.L.Rev. at 799.

For these reasons, the Magistrate is hereby designated to supervise pretrial discovery and to consider and deal with all discovery disputes, other than those matters which by Pretrial Order No. 7 have been delegated by the Court to the Special Masters, and except as may hereafter be ordered otherwise by the Court. In order to clarify the Magistrate's duties, responsibilities, and authority, the Court is contemporaneously herewith issuing Pretrial Order No. 13, which more precisely than the order of February 7, 1978, delineates the Magistrate's powers with respect to this litigation.

Discovery should proceed expeditiously in accordance with the schedule established herein and in conformity with the Statements of Contentions and Proof and the pretrial conferences to be held at six-month intervals. In the meantime, disputes concerning privilege will be resolved by the Special Masters, and all other discovery disputes by the Magistrate. This Court will be available to meet with and to assist the Magistrate, the Special Masters, and the attorneys for the parties during the pretrial period.

Important substantive issues are raised in this action, and the parties are entitled to a judicial process which will fairly, impartially, and expeditiously resolve these issues. It is the Court's purpose to provide them with such a process.

## ON MOTION FOR RECONSIDERATION

Defendants have moved for reconsideration of portions of the Court's rulings of September 11, 1978. As defendants readily concede, notwithstanding its length, the memorandum in support of the motion goes "over much the same ground" as previous submissions (memorandum, p. 201). Except for elaborations of points previously made

and the citation of additional case authority, it advances few contentions not previously considered by the Court. For that reason, while the Court has carefully reviewed every aspect of the motion, the government's reply, defendants' response, and all the accompanying papers, only a limited number of points bear further discussion.[1]

Defendants again contend that the Federal Communications Commission has exclusive jurisdiction over defendants and all or many of their activities, and that the Court therefore lacks jurisdiction over this antitrust suit. Not only was this contention rejected in the September 11 opinion following full briefing and argument, but it had likewise been exhaustively briefed, argued, considered, and found to lack merit by Judge Waddy in 1976. *United States v. Am. Tel. & Tel.*, 427 F.Supp. 57 (D.D.C.), *cert. denied*, 429 U.S. 1071, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977), *cert. denied*, No. 77–1009 (D.C.Cir. May 27, 1977), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977). This issue has thus been considered independently three different times by three different tribunals,[2] and no purpose would be served by plowing over the same ground yet once more.

It might be worth noting on the jurisdictional question only that it is not correct—as defendants keep emphasizing—that unless the Court finds *exclusive* jurisdiction in the Federal Communications Commission, there will be no mechanism for reconciling such conflicts between regulatory and antitrust standards imposed on defendants as might be found to exist with respect to particular conduct. The Court has previously stated that, if and when conflicts of this nature should become apparent after the issues have been crystallized, matters relating to them will be referred to the

---

1. Although the Court has granted defendants' motion to file a 202-page memorandum, well in excess of the limit provided for under the Rules, it does not intend to address every aspect of that document in writing. Contrary to the assumption repeatedly made by defendants (*e. g.*, memorandum, pp. 27, 33, 164, 167), failure specifically to discuss a point does not

warrant the inference that the matter was not considered.

2. I.e., by Judge Waddy in 1976; by the U.S. Court of Appeals in 1977; and by this Court in 1978 (in addition to the denial of two certiorari petitions by the U.S. Supreme Court).

Commission under the doctrine of *primary jurisdiction* (opinion, p. 1329). But for the reasons fully stated in the September 11 opinion, there is no basis for dismissing this antitrust action on FCC-exclusive-jurisdiction grounds. Indeed, in a thoughtful and exhaustive opinion issued within the past two weeks, Judge John F. Grady reached precisely the same conclusion, rejecting arguments very similar to those advanced here. *MCI Communications Corp. v. Am. Tel. & Tel.*, No. 74 C 633 (N.D.Ill., Oct. 6, 1978).[3]

Defendants next contend that the Court should have included the Federal Communications Commission, other independent regulatory bodies, and the United States Postal Service in the concept of the "United States" as plaintiff in this action for purposes of Rule 34 discovery. Inasmuch as defendants expressly disavow seeking reconsideration of the Court's pretrial order in this respect, there is nothing upon which the Court might rule.[4] Nevertheless, in view of the circumstances related in note 4, *supra*, and in order to afford defendants the benefit of every consideration of their claims, the Court has reviewed the arguments made, but has found nothing that would in any way impair the September 11 rulings contained in Part II of the opinion.

 ·One new contention not previously considered is that the Department of Justice might secure from the Federal Communications Commission whatever documents defendants might seek for discovery purposes by causing the President to remove from office any member of that Commission who fails to vote to release such records for this purpose (memorandum, p. 144). However, as *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), makes clear, with respect to members of independent regulatory commissions "a power of removal exists only if Congress may fairly be said to have conferred it.'" In the absence of other legislative direction this means that removal can be effected only "for cause involving the rectitude of a member" (357 U.S. at 356, 78 S.Ct. at 1279). It goes without saying that failure to cooperate in Rule 34 discovery in a civil action brought by the Department of Justice on behalf of the Executive Branch is not "cause involving rectitude."[5]

 It is next argued once again that defendants should not be required to produce documents which were previously turned over to two private antitrust plaintiffs in actions in other districts (*Litton Systems, Inc. v. Am. Tel. & Tel. Co.*, No. 76 Civ. 2512 (S.D.N.Y.1976); *MCI Communications Corp. v. Am. Tel. & Tel. Co.*, Civil No.

---

**3.** Judge Grady concluded, *inter alia*, that there is no basis for concluding that AT&T is immune from the antitrust laws merely because it is a regulated common carrier (slip opinion, pp. 1322–1324); that a finding of immunity with respect to discrete conduct will not result in a dismissal where such conduct is alleged to be part of a pattern of monopolization (opinion, pp. 1325–1331); that the FCC has never authorized, approved, or sanctioned AT&T's allegedly improper conduct with respect to interconnection and that it has not supervised the interconnection practices so closely that its approval of such conduct could be inferred (opinion, pp. 1331–1337); and that AT&T's "sham" tariff filings were likewise not immunized from the antitrust laws by virtue of FCC regulation (slip opinion, pp. 1337–1340).

**4.** The Court denies defendants' unusual request that it take this aspect of defendants' motion under advisement "subject to defendants' right to call up their motion," presumably at any time of their choosing. Motions and other

pleadings filed by the parties will be disposed of by the Court in accordance with established procedures (Rule 6, F.R.Civ.P., Local Rule 1–9) particularly where, as here, the process being proposed would merely cause prolonged uncertainty and confusion. In the Court's judgment, its ruling was correct, and there is thus nothing to take under advisement. Identical considerations apply to defendants' demand that the Court take under advisement pending future defense decision the jurisdictional rulings and the bulk of defendants' objections to the pretrial and discovery procedures embodied in Pretrial Order No. 12.

**5.** Defendants are not without a remedy, however, with respect to possible refusals of regulatory commissions to cooperate in discovery. As the Court has previously stated, it will assist defendants in this area "to the full extent of its authority with respect to any legitimate requests" under Rule 45, F.R.Civ.P. (opinion, p. 1337.

74 C 633 (N.D.Ill.1974)) irrespective of the nexus of the documents to this case. In addition to contentions previously made, defendants state that the Court failed to address, or to address adequately, their reliance upon protective orders in those cases and upon alleged representations by government counsel in *MCI* that those documents would not be sought by the government. That aspect of the matter is dealt with by Judge Grady, the judge in control of the *MCI* litigation, who explained at pp. 3–6 of his October 9, 1978, memorandum decision:

> . . . [W]e do not believe that defendants were justified in regarding either the pretrial order or the discussion with the Department of Justice attorneys as constituting a guaranty that material produced to MCI would be protected from discovery by other parties. As far as the protective order is concerned, it is in terms subject to change by further order of court. (Par. 5). It does not purport to furnish a lifetime guaranty; and even if it did, it would be difficult for a sophisticated litigant to take such a grandiose assurance literally. Where the ends of justice require disclosure, as we believe they do here, it would be irresponsible for a court to enforce perpetual secrecy where the sole ground for doing so is simply that one party wants it. There is no indication that Judge Lynch did or said anything which defendants could reasonably have interpreted as the absolute guaranty they now seek to enforce.
>
> [As concerns the] alleged promise by Mr. Verveer, the Department of Justice attorney, that the Government would not seek to obtain documents produced for MCI in this litigation, . . . [i]t does not make sense to us that so significant an undertaking would have occurred so casually and under the circumstances al-

leged. There was no reason for Mr. Verveer to make such a commitment. There was no negotiation for it and nothing was conceded in return for it . . . Had there really been an understanding of the kind alleged, there was every reason to reduce it to writing. . . .

> Under all of the circumstances, this court simply does not believe that Mr. Verveer made the commitment attributed to him by defendants. Furthermore, the defendants own conduct at the time is inconsistent with the hypothesis that they thought he had made it.

Moreover, defendants' arguments concerning the protective orders prove too much. They contend in this Court that because the *MCI* and *Litton* documents are under protective orders, they are beyond the reach of discovery here. At the same time, they are arguing in the U.S. Court of Appeals for the Seventh Circuit (Appendix B to defendants' response to the government's reply to motion for reconsideration) that the *MCI* court is without authority to lift a protective order once entered. If these contentions are correct, defendants would be immunized, as a practical matter, from ever having to provide adequate discovery in this action. A great many private lawsuits are pending against AT&T throughout the country, a number of them involving protective orders. It could hardly be that meaningful discovery from defendants in this case must await the day when all of those actions are finally concluded, ending only at that time the claimed document immunity provided by the protective orders.[6] Records may of course be relevant to one, two, or ten different lawsuits, and there is no basis for concluding that the court in which they happen to have been produced first has the power, by virtue of that fact, to preclude their production when a litigant in another action[7] legitimately

---

**6.** On defendants' theory, the immunity may not end even then. This week they objected in this Court to a request for the production of documents apparently used as evidence during a trial, on the ground that production would violate a protective order of the U.S. District Court for the District of South Dakota. *TV*

*Signal Company of Aberdeen v. Am. Tel. & Tel. Co.*, Civ. Action No. 70–6N (D.S.D. July 5, 1978).

**7.** Different considerations may be applicable when, as in *GAF Corporation v. Eastman Kodak Company*, 415 F.Supp. 129 (S.D.N.Y.1976),

requires them for the preparation of his case.[8]

Defendants also argue that this Court assumed that relevancy of the *MCI* and *Litton* documents for purposes of this case would be "assured by their having been thoroughly screened for relevancy in the private actions" (memorandum, pp. 173–4). The quoted statement and the text surrounding it simply omit entirely any reference to the relatively lengthy discussion in the Court's opinion (pp. 1339-1341) which concluded that relevancy was guaranteed primarily by the circumstance that the subject matter in the instant case virtually embraces the subject matter in *MCI* and *Litton*, and that what was relevant there is therefore almost a fortiori relevant here.[9]

■ Defendants contend that under the pretrial and discovery plan set forth in the September 11 orders they, and the government, will be restricted to the discovery of evidence admissible at trial, and that they will be precluded from discovery relevant to the "subject matter" of the action. That contention misconceives the Court's ruling. Under the pretrial order, the parties may at all times during the pretrial stages specified in the order engage in "discovery regarding any matter . . . which is relevant to the subject matter involved in the pending action," that is, which relates to the claims or defenses of the parties. Rule 26(b)(1), F.R.Civ.P. As explained in the Rule, this includes not only items which would be admissible at trial, but also "items reasonably calculated to lead to the discovery of admissible evidence." What Pretrial Order No. 12 provides is that prior to the filing of the Statements of Contentions and Proof, the "subject matter" of this action is determined by the claims and defenses raised in the Complaint and Answer, while thereafter it is defined by the pretrial orders entered following the filing of each set of Statements.[10] Under Rule 16, F.R.Civ.P., the pretrial orders will successively narrow the subject matter in accordance with the material issues (as defined in the Statements and at the special pretrial conferences). Thus, as the issues in the somewhat amorphous Complaint and Answer achieve greater precision, the scope of discovery under Rule 26(b)(1) will appropriately narrow in conjunction with them.[11]

the records are demanded not in an existing litigation context or are sought for some other purpose. It is in such circumstances, or to protect confidentiality, that protective orders serve their real purpose.

8. This Court in its September 11 ruling indicated that for reasons of comity leave should be sought from the courts which had entered protective orders—and of course the *MCI* court has already granted its permission. However, conceptually such leave is not a prerequisite to an order to defendants to produce copies of their own records in this lawsuit in which they are parties. A contrary rule might well lead to unseemly scrambles between litigants and clashes between courts for records which are equally needed in several places. The sensible solution to this dilemma is that adopted by Judge Grady who interpreted the protective order in the Northern District of Illinois as not depriving the litigants here of their needed discovery since "the ends of justice require disclosure" for purposes of the instant action.

9. This lack of mention of the principal basis of the Court's holding on this issue is compounded by the fact that the reference to the Court's opinion is so couched as to be misleading. The opinion of September 11 does not state that relevancy is assured by the screening process, but that relevancy of the documents "is *further* assured by their having been thoroughly screened for relevancy in the private actions" (emphasis added) (opinion, p. 1341).

10. Inasmuch as issues will in all likelihood not have been delineated with any degree of precision after the filing of the first set of Statements and prior to the filing of the second, a special pretrial conference would probably not serve a useful purpose at that juncture, although it is not excluded should it appear to be helpful for discovery or other purposes. Further, the subject matter of the action will have been narrowed in any event during that period by the Statements filed in conformity with Pretrial Order No. 12.

11. Defendants' objection to this procedure, if accepted by the Court, would preclude for the indefinite future both a narrowing of the issues and a limitation on discovery—devices well sanctioned by the Rules, and regarded by both courts and textwriters as indispensable to the achievement of substantive dispositions within a reasonable time, especially in cases of this kind. See, *e. g., Life Music, Inc. v. Broadcast Music, Inc.*, 31 F.R.D. 3 (S.D.N.Y.1962); *United*

Finally, it is argued that the pretrial and discovery plan embodied in the pretrial orders was adopted without consultation with the parties. Even if this claim were correct, it would not impair the validity of the procedures, for the Court is responsible for setting the timing of the pretrial phases of the litigation, and its decision obviously is not inappropriate or invalid merely because specific provisions were not proposed by the parties. In any event, not only did the Court have before it the government's proposals, Magistrate's Discovery Order No. 2, and defendants' appeal from that order (all of which deal with the subject of pretrial and discovery scheduling), but it specifically set down for the August 21, 1978, status hearing the issue of "whether present orders . . . establishing responsibilities and schedules for further proceedings, including further discovery and orders of proof are adequate, and if not, how they should be modified." The Court does not deem that it is precluded from proceeding to carry out its responsibilities because defendants did not propose a specific procedure for proceeding with the pretrial phases of this litigation.

For the reasons stated herein and in the Opinion of September 11, 1978, it is this 18th day of October, 1978,

ORDERED That the motion for reconsideration be and it is hereby denied.

---

*States v. Standard Oil Company (New Jersey)*, 23 F.R.D. 1, 4 (S.D.N.Y.1958); R. McLaren, *Procedure in Private Antitrust Cases*, 21 F.R.D. 440, 446–47 (1957); J. Withrow and R. Larm, *The "Big" Antitrust Case: 25 Years of Sisyphean Labor*, 62 Cornell L.Rev. 1, 26–30 (1976);

and the authorities cited in note 94 of the September 11 opinion. See also Rules 15, 16, and 21, F.R.Civ.P.